629 S.E.2d 783

**In re: BRANDON LEE H.S.**

**No. 32872.**

Supreme Court of Appeals of West Virginia.

Submitted March 1, 2006.

Decided April 6, 2006.

Darrell V. McGraw, Attorney General, C. Carter Williams, Assistant Attorney General, Petersburg, Attorneys for the Appellant.

Margaret B. Gordon, Berkeley Springs, Guardian Ad Litem.

1. While there is a second contempt order that was entered on February 7, 2005, DHHR notes that "[b]oth orders basically make the same findings of fact and conclusions of law, and order the Department to undertake various actions concerning the operations of its Child Protective ... unit in the Eastern Panhandle District comprised of Berkeley, Jefferson and Morgan Counties." Consequently, we will refer collectively to both orders as the "contempt order."

Tracy Weese, Shepherdstown, Attorney for the Appellee.

PER CURIAM:

The West Virginia Department of Health and Human Resources (hereinafter referred to as "DHHR" or the "Department") appeals from the January 26, 2005, order [1] entered by the Circuit Court of Berkeley County holding it in contempt due to its failure to provide sufficient staff resources to enable the Child Protective Services unit of the Martinsburg, West Virginia, DHHR office to fulfill its mandatory responsibilities. The entry of the circuit court's order was stayed for sixty days to permit DHHR to purge itself of the contempt ruling. Upon our review of the record in this matter, DHHR has implemented the necessary measures to purge itself of the contempt ruling.

I. Factual and Procedural Background

The contempt order that is the subject of this action arose out of an abuse and neglect proceeding that evidenced specific staffing problems that the Child Protective Services unit was experiencing in the Eastern Panhandle counties of this state. The abuse and neglect proceeding was initiated following the positive testing of infant Brandon Lee H.S.[2] for traces of cocaine, marijuana, and amphetamines upon his premature birth on October 22, 2004. As a result of this testing, an immediate referral was made to Child Protective Services. The circuit court awarded DHHR emergency temporary custody of Brandon on October 26, 2004, and Brandon was placed in foster care upon his discharge from the hospital.[3]

A preliminary hearing was scheduled for November 5, 2004, to address whether there was probable cause for continuing the award of emergency custody to DHHR. When both of Brandon's parents waived their rights to

2. As is this Court's longstanding practice, we identify this individual by initials only based upon the sensitive nature of the matter. *See In re Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

3. He remained in the legal custody of DHHR at the time of his foster care placement.

this preliminary hearing, the circuit court confirmed the actions of DHHR in acquiring legal custody of Brandon. Through its order entered on November 5, 2004, the trial court ordered that Brandon's parents be subjected to random drug screens and directed that visitation with Brandon be arranged at the discretion of DHHR. In this same order, the circuit court included the following language:

> In reviewing this case, the Court finds that D.H.H.R. located in the Eastern Panhandle of West Virginia is dangerously understaffed, with as many as 12 unfilled staff positions. The Court finds that this may be putting infants in the Eastern Panhandle at risk. Further, the Court finds that this interferes with the proper oversight that D.H.H.R. should be giving to this case, including proper visitation and considerations of placement.

The trial court set this matter for adjudication on December 6, 2004.[4]

On November 30, 2004, the Child Protective Services supervisor learned that Brandon's case had not yet been assigned within the Department.[5] Brandon's father and the guardian ad litem appointed to represent Brandon's interests filed a petition for contempt in which they alleged that the Department failed to properly staff this case and complained of the resulting delay in scheduling visitation, as well as in initiating drug-related services. Brandon's father raised an additional complaint concerning the Department's failure to conduct a home visit to determine if placement with him would be appropriate.[6]

On December 15, 2004, the hearing on the contempt petition began.[7] With respect to the underlying allegations of contempt per-

taining to the failure of the Martinsburg Child Protective Services unit to staff Brandon's case, the trial court found that these failures were "not the result of any 'willful, intentional, or contumacious act' on the part" of the local DHHR employees. However, based upon testimony offered by several DHHR workers regarding the status of conditions at the Martinsburg Child Protective Services office, the circuit court ruled that

> the Secretary of the Bureau for Children and Families and the Commissioner and Deputy Interim Commissioner of the West Virginia Department of Health and Human Resources are in contempt of their obligation under West Virginia law to provide sufficient resources so that the Martinsburg CPS Unit of D.H.H.R. can fulfill its obligations in the present case, as well as to assure the "safety and guidance" of other children in its custody and in the Eastern Panhandle of West Virginia.

The trial court expressly concluded that the ongoing failure to provide sufficient staffing was "willful, intentional, and contumacious" in light of the fact that "the Secretary has known of the problem at the CPS unit at D.H.H.R. in Martinsburg since 2000, and more particularly since the beginning of 2004, but has taken no action to remedy the situation."

In fashioning the conduct required by the Department to purge the contempt finding, the trial court identified specific directives all aimed at solving the staffing crisis at the Martinsburg Child Protective Services office. The dictates required by the circuit court included the immediate hiring of workers to fill the numerous office vacancies and various

---

4. While the order indicated that the hearing was to occur on December 6, 2003, the designation of the year was clearly a typographical error.

5. This error resulted based on alleged miscommunication within the unit when the investigative worker originally assigned to the case left the Department's employ on the same date as the preliminary hearing. While Department policy apparently required that the vacated position should have resulted in the staffing of the case by either a long-term or an ongoing Child Protective Services worker, this assignment did not occur and was not discovered until November 30, 2004.

6. The Department notes that there is no directive contained in the November 5, 2004, order, providing for such a home visit. In addition, the Department maintains that a home visit could not have been performed due to the fact that the father was adamant that his parents, with whom he resided, were not to be informed about the fact that Brandon tested positive for having drugs in his system at birth.

7. The hearing was continued and completed on December 17, 2004.

measures designed to expedite the training of new hires, as well as certain salary incentives, including the use of geographic pay differentials designed to forestall the heavy attrition rate purportedly due to workers leaving to work in contiguous states. The trial court provided for a sixty-day stay of its order to provide the Department with sufficient time to implement the necessary measures to purge itself of the contempt finding. Arguing that it timely effectuated the actions required of it to be purged from the contempt order, DHHR seeks relief from this Court.

## II. Standard of Review

■ The standard pursuant to which we review civil contempt orders was identified in syllabus point one of *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996):

> In reviewing the findings of fact and conclusions of law of a circuit court supporting a civil contempt order, we apply a three-pronged standard of review. We review the contempt order under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.

Accordingly, we proceed to determine whether error was committed by the trial court in entering the contempt order that is the subject of this proceeding or in refusing to purge the Department of the contempt order.

## III. Discussion

■ In challenging the entry of the contempt order that is the subject of this appeal, DHHR maintains that it had corrected the inaction relative to Brandon's case concerning both visitation and services and had complied, to the extent possible, with the trial court's directives concerning staff-related issues by the time of the hearing on the contempt petition. As a result, DHHR maintains the trial court erred in refusing to enter an order finding that the Department purged itself of the contempt rulings set forth in the January 26, 2005, order.[8] In addition, the

Department contends that certain procedural infirmities exist with regard to the contempt ruling due to the lack of service of process that was effectuated on the agency directors who were held in contempt individually.

■ We begin our analysis of this matter with a review of civil contempt. In *State ex rel. Robinson v. Michael*, 166 W.Va. 660, 276 S.E.2d 812 (1981), we explored the distinction between civil and criminal contempt, and found that "whether a contempt is civil or criminal depends upon the purpose to be served by imposing a sanction for the contempt and such purpose also determines the type of sanction which is appropriate." *Id.* at 660, 276 S.E.2d at 813, syl. pt. 1, in part. We further instructed that

> [w]here the purpose to be served by imposing a sanction for contempt is to compel compliance with a court order by the contemner so as to benefit the party bringing the contempt action by enforcing, protecting, or assuring the right of that party under the order, the contempt is civil.

*Id.* at 660, 276 S.E.2d at 813, syl. pt. 2.

The Department argues that the court order necessary to serve as the predicate for a civil contempt ruling is the November 5, 2004, order. Maintaining that the terms of that order solely control the issue of whether it has purged itself of non-compliant conduct, the Department argues that the November 5, 2004, order contained only two specific directives with regard to Brandon's case. Those directives were:

(1) "It is further Ordered that the Respondents shall cooperate with ASI[9] evaluations and with random drug screens, all to be paid for by D.H.H.R."; and

(2) "It is further Ordered that the Respondents' visitation with the Infant, and placement of the Infant, is [sic] in the discretion of the D.H.H.R."

Emphasizing that the petition for contempt and the rule to show cause rely entirely on the November 5, 2004, order as the basis for

---

8. *See supra* note 1.

9. The Abuse Severity Index involves an evaluation performed to determine the level, if any, of an individual's addiction.

the alleged contempt, the Department maintains that at the time of the hearing on the petition for contempt it had resolved, to the extent of its capabilities, each of the actions related to Brandon's case that were complained of in the petition.[10]

■ DHHR contends that the trial court's contempt order exceeded the permissible scope of the November 5, 2004, order by mandating extensive staffing directives that are unrelated to Brandon's case. The Department objects to the trial court's use of the contempt order to compel conduct on its behalf with regard to staffing issues that have no application to the Brandon case and are beyond the authority of the judicial branch of government to address.

While the Department is correct in stating that the November 5, 2004, order only contained two specific directives with regard to the action required in connection with Brandon's case, the order does contain language finding that the current staff shortage of twelve unfilled positions directly impacts on "the proper oversight that D.H.H.R. should be giving to this case, including proper visitation and considerations of placement." [11] Given the trial court's recognition in the November 5, 2004, ruling of how the staff shortage was contributing to the attention that the Department could necessarily give all cases, not just Brandon's case, we do not find the inclusion of staffing directives in the contempt order to be beyond the scope of the predicate order. Clearly, the staffing concerns were not being raised for the first time in the contempt order and, as a constitutional officer charged with upholding the numerous statutory enactments that govern the protection of this state's children from abuse and neglect,[12] the trial court had the authority, subject to the limitations required in this opinion, to compel the Department to act to remedy the serious effects of the significant staff shortage at issue, specifically, in this case and, generally, in other abuse and neglect proceedings before that court.

Numerous statutes evidence the paramount importance that we attach to protecting and safeguarding this state's children from abusive and neglectful environs. In chapter forty-nine of the West Virginia Code, a body of statutory law devoted exclusively to child welfare, it is recognized that "[t]he purpose of this chapter is to provide a coordinated system of child welfare and juvenile justice for the children of this state that has goals to: (1) Assure each child care, safety and guidance[.]" W.Va.Code § 49–1–1(a)(1) (1999) (Repl.Vol.2004). Included in this chapter of the Code is an article expressly devoted to handling reports of children suspected of abuse or neglect. *See* W.Va.Code § 49–6A–1 to –10 (1977) (Repl.Vol.2004). That the state is serious about its creation of "a comprehensive system of child welfare" such that "no child subjected to abuse or neglect shall be left without assistance" is abundantly clear from our laws in this area. W.Va.Code §§ 49–6D–2(a), (b)(2) (1984) (Repl.Vol.2004). Inherent in the enactment of the multiple provisions addressing the protection of this state's children is recognition "of the State's responsibility to assist the family in a manner consonant with the purposes of this article [6D—Child Protective Services Act]" which includes as one of its stated purposes the goal of "secur[ing] to a child removed from the family a degree of custody, care and control consistent with the child's best interests." W.Va.Code §§ 49–6D–2(a), –2(b)(6). Included in the statement of intent for article 6D of chapter 49 is the

---

**10.** Those four items were that: (1) DHHR had failed to staff this CPS case to the ongoing CPS unit; (2) DHHR had failed to exercise discretion regarding visitation and/or failed to arrange visitation with the parents; (3) DHHR had failed to exercise discretion with regard to possible placement of the child with the father; and (4) DHHR had failed to contact the parents regarding implementation of services, visitation, and placement.

**11.** The guardian ad litem notes that language similar to that which the trial court inserted in the November 5, 2004, order regarding the DHHR staffing crisis in the Eastern Panhandle was included in orders entered by Judge Sanders in other abuse and neglect cases in the Fall of 2004. She opined that these "statement[s] reflected the Circuit Court's deepening concern about the deteriorating staff situation at DHHR in Martinsburg."

**12.** *See generally* W.Va.Code § 49–1–1 to 49–9–17 (Repl.Vol.2004).

express recognition that the "legislature enact[ed] this article to provide for the protection of the children of this State from abuse and neglect *and to provide direction to responsible state officers.*" W.Va.Code § 49-6D-2(a)(emphasis supplied).

Given the critical nature of the issues presented by abuse and neglect proceedings, as well as the clear legislative recognition of the duties incumbent on the state and its officers to act in the best interests of the child "while recognizing ... the fundamental rights of parenthood," we cannot fault the trial court for addressing the issue of unfilled Child Protective Services positions in the contempt order. W.Va.Code § 49-6D-2(a). That the unfilled positions played a part in the delayed assignment of Brandon's case to a Child Protective Services worker cannot be doubted. Thus, in directing that the vacant positions be immediately filled, the trial court was acting in furtherance of the legislatively recognized need to "provide direction to responsible state officers" in the interest of securing the full and proper implementation of specific abuse and neglect statutes. W.Va. Code § 49-6D-2(a). Accordingly, we do not find the inclusion of directives that pertain generally to the issue of hiring additional personnel to fill the vacant positions within DHHR to render the contempt order unenforceable. That is not to say, however, that all of the hiring-related directives are enforceable.

█ While we agree in principle with the circuit court's directives aimed at hiring and expediting the training process so that the new Child Protective Services workers could be actively handling cases as quickly as possible,[13] we cannot uphold the specific mandate that requires the implementation of geographic pay differentials for DHHR employees located in the Eastern Panhandle of this State. As support for such pay differen-

tials, the trial court and the guardian ad litem both look to legislation that allows the "transfer [of] funds between all general revenue accounts under the [DHHR] secretary's authority." W.Va.Code § 49-6-1a (1994) (Repl.Vol.2004). In addition, they rely upon a Division of Personnel regulation that authorizes the State Personnel Board to "approve the establishment of pay differentials to address circumstances such as class-wide recruitment and retention problems, [and] regionally specific geographic pay disparities...." W.Va. R. *Personnel* 143 § 1-5.4(f)4 (2003).[14] Appellees maintain that these provisions, combined with the legislative mandate to "provide to the local child protective service such assistance [upon request]... as will enable it to fulfill its responsibilities," require the use of geographic pay differentials. W.Va.Code § 49-6A-9(e).

The Department correctly recognizes that the directives in the contempt order which compel DHHR to establish and implement geographic pay differentials for the Child Protective Services unit in the Eastern Panhandle District run afoul of the Separation of Powers doctrine. *See W.Va. Const.* art. V, § 1. We recognized in syllabus point one of *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 279 S.E.2d 622 (1981), that article V, section one of the West Virginia Constitution is part of the fundamental law of the state and must be strictly construed and closely followed. The separation of powers doctrine requires that the specific functions of the legislative, executive, and judicial branches of government are to be kept distinct. *See State ex rel. State Bldg. Comm'n v. Bailey,* 151 W.Va. 79, 87, 150 S.E.2d 449, 454 (1966).

Although this Court has recognized that the realities of modern governance sometimes require an overlapping of functions between the three branches,[15] the implemen-

---

**13.** In its order, the trial court alludes to the Department's use of an antiquated and protracted training program for newly hired employees.

**14.** These regulatory provisions were adopted pursuant to West Virginia Code § 29-6-10(2) (1999) (Repl.Vol.2004). Any such pay plan that incorporates geographic pay differentials "shall become effective only after it has been approved

by the governor after submission to him by the [State Personnel] board." *Id.*

**15.** *See, e.g., Appalachian Power Co. v. Public Serv. Comm'n,* 170 W.Va. 757, 759, 296 S.E.2d 887, 889 (1982) (recognizing that "in order to make government workable and economical, it must lend itself to practical considerations" that may include "some overlapping of judicial and administrative duties)" (quoting *Chapman v. Hunt-*

tation of geographic pay differentials does not fall into that permissible ambit of branch overlap that would allow the judicial branch to invade the executive branch's jurisdiction over the salaries of its employees.[16] As the Department observes, while it certainly may submit a request to the Division of Personnel, whether a geographic pay differential should be implemented is a decision that lies within the discretion of the Personnel Board. By statute, an agency first recommends a pay differential to the Personnel Board, and if the Personnel Board agrees with the recommendation, the issue must then be referred to the Governor for final approval before a pay differential may be implemented. *See* W.Va. R. 143 *Personnel* § 1–5.4(f)4; W.Va.Code § 29–6–10(2) (1999) (Repl.Vol. 2004). In concluding that a geographic pay differential is mandatory, both the guardian ad litem and the trial court overlook the critical element of discretion that is involved. Circumventing both the separation of powers issue and the discretionary nature of such a decision, the circuit court and guardian ad litem suggest that the issue of pay differentials is compelled based on the inclusion of mandatory statutory language directing that all state "departments, boards, bureaus and other agencies" are to provide assistance to the local child protective service, upon request, to "enable it [DHHR] to fulfill its responsibilities." W.Va.Code § 49–6A–9(e).

In syllogistic fashion, the trial court and the guardian ad litem attempt to convince us that pay differentials are *mandatory* based on statutory language that (a) compels DHHR to assure the "care, safety and guidance" of children in its custody; and (b) charges all agencies, bureaus, and boards to assist DHHR with the fulfillment of its responsibilities. *See* W.Va.Code §§ 49–1–1(a)(1), 49–6A–9(e). This argument—that the geographic pay deferential is mandatory—is simply indefensible. While the Division of Personnel has the discretionary authority, by regulation, to act upon an agency's request for a geographic pay deferential, there is no statutory language that requires the implementation of such salary enhancements. Moreover, as the Department explains, the issue of geographic pay differentials is one that necessarily must be made solely by the executive branch. This is because such a decision must take into consideration a host of other factors that necessarily includes issues such as how a differential affects pay grades, classifications, and budgetary constraints, as well as the potential for grievance filing by employees outside the geographic area selected to receive a pay differential.

While we do not wish to downplay the unacceptable situation that the trial court found itself presented with in regularly presiding over abuse and neglect cases during a period when DHHR staff vacancies reached crisis proportions, the extreme nature of those facts does not justify an invasion of the executive branch's province to set the salaries of its employees. Notwithstanding the legislative recognition of a need to increase the number of child protective services workers and investigators and the granting of authority to the DHHR Secretary to "transfer funds between all general revenue accounts under the secretary's authority," these acts do not constitute a legislative invitation to encroach upon the separation of powers between the three governmental

---

*ington W.Va. Housing Auth.,* 121 W.Va. 319, 336, 3 S.E.2d 502, 510 (1939)); *Crain v. Bordenkircher,* 180 W.Va. 246, 376 S.E.2d 140 (1988) (holding by judicial branch directing executive branch to construct new correctional facility because of unconstitutional penitentiary conditions).

**16.** The guardian ad litem suggests that this Court recognized in *Hewitt v. State DHHR,* 212 W.Va. 698, 575 S.E.2d 308 (2002) (*Hewitt I*), that a state court has the power to order state officials to fulfill mandatory duties including the expenditure of executive agency funds. *Hewitt I* acknowledged that due to the "necessary interworkings of the judicial branch and the executive branch in instances of cases involving children who require the services of this state," that the judicial branch may properly be involved in setting expert fees that may be charged in such cases. 212 W.Va. at 703 n. 9, 575 S.E.2d at 313 n. 9. That limited observation, which pertains solely to expert fee setting, cannot be extrapolated to support the guardian ad litem's contention that the judicial branch has the power to encroach upon the salary setting jurisdiction of the executive branch based on its statutory duty to protect children. *Hewitt I* simply does not support such a wholesale incursion on the executive branch's domain.

branches that is constitutionally mandated. W.Va.Code § 49-6-1a. Quite simply, the trial court was without power to require the use of geographic pay differentials in its desire, albeit laudatory, to immediately fill those vacant Child Protective Services positions. *See State ex rel. Canterbury v. County Court*, 151 W.Va. 1013, 1019, 158 S.E.2d 151, 156 (1967) (recognizing that separation of powers provision precludes courts from exercising administrative duties relating to executive branch in refusing to use judicial power of mandamus to control fiscal affairs of county court); *cf. State ex rel. Lambert v. Cortellessi*, 182 W.Va. 142, 148, 386 S.E.2d 640, 646 (1989) (issuing writ of mandamus directing county commission to give due consideration to duties and responsibilities of employees of county clerk's offices to provide "reasonable and proper" funds for performance of statutory duties of office).

In contrast to those cases where this Court has exercised judicial power when the budgets of county officers were arbitrarily reduced and the performance of statutory duties thereby affected, this case does not present a situation where the wrongful denial of funds to constitutional officers required judicial intervention to mandate adequate funding for the fulfillment of specific job duties. *See Cortellessi*, 182 W.Va. at 148 n. 6, 386 S.E.2d at 646 n. 6 (directing that respective county commissions could not "act arbitrarily by providing clearly inadequate funds for the performance of the statutory duties of the county officers"); *State ex rel. Ginsberg v. Naum*, 173 W.Va. 510, 318

S.E.2d 454 (1984) (holding that county commission has fiscal responsibility to provide prosecuting attorney with sufficient staff for duties of office). While we are convinced that the trial judge, in inserting staff-related directives in the contempt order, was acting solely out of concern for the best interests of the children placed in the state's custody pursuant to our abuse and neglect laws, and that his actions were certainly driven by the lack of action taken by the previous administration's DHHR officers,[17] we simply lack the authority to address the employment terms of the Department's staff—issues that are unquestionably administrative in nature.[18] Those functions are solely in the realm of the executive branch of government.

◼ With regard to the issue raised by the Department concerning the lack of service of process effected on the individual agency officials [19] who were named in the contempt order, we find this argument less than compelling. The crux of the contempt order was to resolve the immediate issues of visitation and drug testing in the Brandon case and to remedy the unfilled Child Protective Services positions. In not providing the individually named agency heads with separate service of process of the contempt proceedings, DHHR suggests that due process standards of notice and an opportunity to be heard were violated. *See generally, In Re Yoho*, 171 W.Va. 625, 629–30, 301 S.E.2d 581, 586 (1983).

Critically, as the guardian ad litem notes, these officials were never subject to any sanctions in connection with the contempt finding. Moreover, there is no question that

---

**17.** We wish to acknowledge the huge improvements that the Department has made under the leadership of the current DHHR Secretary, Martha H. Walker, who upon taking office, immediately proposed sweeping changes to improve the employment conditions of Child Protective Service workers throughout the state. We suspect that the actions taken by Secretary Walker were impelled, at least in part, by the continuing interest and careful monitoring of the DHHR staff vacancies by Judge Sanders.

**18.** While the trial court framed the contempt order in terms of "whether the CPS unit at the D.H.H.R. office serving the Eastern Panhandle of West Virginia has sufficient resources to fulfill its obligations," the issue of adequate funds was never raised by DHHR. In fact, the guardian ad litem notes that plenty of funds were available

for staff hiring purposes due to the unfilled positions. We are certainly cognizant of the fact that the starting salary figure for the Child Protective Services worker may have contributed to the staff vacancies; however, the funds available for such salaries had not been arbitrarily reduced by the Department. Absent arbitrary conduct by the executive branch that placed job performance in jeopardy, this Court has no power to compel action with regard to fiscal issues under the Department's control. *See Canterbury*, 151 W.Va. at 1019, 158 S.E.2d at 156.

**19.** The Secretary of the Bureau for Children and Families, which is part of DHHR; and the Commissioner and Deputy Commissioner for DHHR, were named individually by the trial court in the contempt order.

they were aware of the staff shortage situation at the Martinsburg office. The circuit court merely named these individuals in recognition of the fact that an organization such as DHHR can only act through its officials. We presume that the circuit court's naming of these individuals in the contempt order was intended solely for the purpose of resolving the staff shortage in an expedited fashion. Rather than seeking to impose any form of individualized sanctions against these agency officials, the trial court was attempting to get the necessary players—those with hiring powers—on board immediately.

While the better practice is always to adhere to procedural requirements which necessarily include due process protections, in this case the lack of any sanctions against the agency heads combined with the fact that the agency itself was clearly a party to this proceeding who received full notice and an opportunity to be heard, suggest that the lack of individual service does not render the contempt order fatally defective.[20] Because these individuals were named in their professional capacities, they did not incur any expenses for legal representation. In short, we can find no prejudice to have been sustained as a result of the inclusion of the individual DHHR officers in the contempt order.

We are similarly unpersuaded by the Department's argument that the trial court violated the notice provisions included in West Virginia Code § 55–17–1 (2002). That chapter was enacted to codify the procedures to be used "in certain civil actions filed against state government agencies and their officials." W.Va.Code § 55–17–1(b). Consequently, chapter 55 is inapplicable to the case *sub judice* as the contempt proceeding arose out of an abuse and neglect matter—a proceeding initiated by a government agency. Given the inapposite nature of that chapter of the Code to the matter before us, we do not further address this issue.

Based on the foregoing, we determine that DHHR has fully complied with the portions of the contempt ruling issued by the Circuit Court of Berkeley County that are properly within its power and authority to act. Accordingly, we remand this matter to the circuit court for entry of an order finding that the Department has purged itself of the contempt rulings contained in the January 26 and February 7, 2005, orders and dismissing this contempt action from the docket of the trial court.

Remanded.

---

20. Although we conclude in this particular case that the lack of compliance with service of process requirements on the individual agency heads is not a fatal defect given the specific factual and legal parameters of this case, we do not suggest that due process requirements can be disregarded when individuals outside the jurisdiction of the trial court are determined to be necessary parties to the proceedings. The protections guaranteed to all citizens by the due process provisions of the state constitution are fundamental to our system of jurisprudence and are vital to securing the implementation of proceedings in a manner that fully comports with principles of fundamental fairness. While those due process protections were not observed with regard to the individual agency heads found by the lower court to be in contempt, we cannot find a consequent violation of the precepts of fundamental fairness to have resulted in this case. The practically immediate purging of any contempt—resulting from the prompt action of those agency heads to address the concerns of the lower court (other than geographical salary differentials)—has led inexorably to our decision today finding a purging of any contempt and, in practical effect, mooting the due process issues. In another case, however, the failure to effect personal service on necessary parties may cause a similar action to be rendered fatally defective for noncompliance with constitutionally significant procedural requirements.