IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2015 Term

**FILED**

**October 7, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Nos. 14-0664 and 14-0845

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
BUREAU FOR BEHAVIORAL HEALTH AND HEALTH FACILITIES,
Respondent Below, Petitioner

v.

E.H., et al.
Petitioners Below, Respondents

Appeal from the Circuit Court of Kanawha County
Honorable Louis H. Bloom, Judge
Civil Action No. 81-MISC-585

AFFIRMED, IN PART, AND REVERSED, IN PART

Submitted: September 2, 2015
Filed: October 7, 2015

Patrick Morrisey, Esq.
Attorney General
Elbert Lin, Esq.
Solicitor General
Daniel W. Greear, Esq.
Chief Counsel
Julie Marie Blake, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Petitioner

Lydia C. Milnes, Esq.
Jennifer S. Wagner, Esq.
Mountain State Justice, Inc.
Charleston, West Virginia
Attorneys for the Respondents

JUSTICE LOUGHRY delivered the Opinion of the Court.
JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1.  In the context of institutional reform litigation, this Court may choose to exercise its appellate jurisdiction over an order entered by the circuit court that it deems to approximate a final order by its nature and effect.

2.  "Inherent in the republican form of government established by our State Constitution is a concept of due process that insures that the people receive the benefit of legislative enactments." Syl. Pt. 1, *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1982).

3.  "It is the obligation of the State to provide the resources necessary to accord inmates of State mental institutions the rights which the State has granted them under *W.Va. Code*, 27-5-9 [1977]." Syl. Pt. 3, *E.H. v. Matin*, 168 W.Va. 248, 284 S.E.2d 232 (1981).

LOUGHRY, Justice:

This case is before the Court on the consolidated appeals of the petitioner, the West Virginia Department of Health and Human Resources, Bureau for Behavioral Health and Health Facilities (the "DHHR," unless otherwise indicated), seeking relief from the June 3, 2014, and August 13, 2014, orders of the Circuit Court of Kanawha County. As grounds for this appeal, the DHHR asserts: (1) this Court has appellate jurisdiction to consider these appeals despite the circuit court's failure to certify the challenged orders as partial final judgments; (2) the circuit court exceeded its authority under the separation of powers doctrine and our West Virginia precedent by compelling compliance with an Agreed Order entered on July 2, 2009, through the immediate implementation of a pay raise restructuring plan at two state mental health hospitals; and (3) it reasonably believed the 2009 Agreed Order only required an increase to the salaries of existing direct care employees. Following a careful review of the briefs, the arguments of counsel, the lengthy appendix record submitted, and applicable law, we reverse the circuit court's refusal to declare the particular rulings on appeal as partial final judgments, but we otherwise affirm the orders at issue.

1

## I. Facts and Procedural Background[1]

In order to fully appreciate the circuit court's rulings on appeal, it is necessary to review the history of this institutional reform litigation that began in 1981 when a group of patients at the Mildred Mitchell-Bateman Hospital ("Bateman")[2] filed a mandamus action in this Court seeking judicial intervention for deplorable conditions described as the "'Dickensian Squalor' of unconscionable magnitudes of West Virginia's mental institutions." *E.H. v. Matin,* 168 W.Va. 248, 249, 284 S.E.2d 232, 233 (1981) (internal citation omitted) ("*Matin I*"). The Court stated that it was only being asked "to order the executive branch to fulfill its obligation under clear and unambiguous statutory provisions[,]" recognizing that the Legislature had previously "acknowledged its concern for both humane conditions of custody and effective therapeutic treatment . . ." through its passage of West Virginia Code § 27-5-9[3] in 1977. *Matin I*, 168 W.Va. at 257, 284 S.E.2d at 237. The Court transferred the case to the Circuit Court of Kanawha County for the purpose of monitoring compliance while bearing in mind the following:

> (1) *W. Va. Code*, 27-5-9 [1977] creates specific enforceable rights in the entire inmate population of the State's mental

---

[1]The facts and procedural history set forth herein have been gleaned from the parties' briefs, the appendix record filed in the instant consolidated appeals, as well as the prior opinions of this Court entered in this institutional reform litigation.

[2]At the time this litigation was instituted, Bateman, which is located in Huntington, West Virginia, was known as Huntington State Hospital.

[3]West Virginia Code § 27-5-9 sets forth the rights of patients involuntarily committed to our state mental health hospitals.

> hospitals. (2) *W. Va. Code*, 27-5-9 [1977] requires a system of custody and treatment which will reflect the competent application of current, available scientific knowledge. Where there is a good faith difference of opinion among equally competent professional experts concerning appropriate methods of treatment and custody, such differences should be resolved by the director of the West Virginia Department of Health and not by the courts. (3) It is the obligation of the [S]tate to provide the resources necessary to accord inmates of mental institutions the rights which the State has granted them under *W. Va. Code*, 27-5-9 [1977].

*Matin I*, 168 W.Va. at 259-60, 284 S.E.2d at 238. In 1983, the parties agreed to the West Virginia Behavioral Health System Plan, which the circuit court accepted. This Plan, which was designed to address the problems identified by the parties, was to be implemented by the DHHR with oversight by the circuit court and a court monitor.

Ten years later, the matter was again before this Court. *See E.H. v. Matin* ("*Matin II*"), 189 W.Va. 102, 428 S.E.2d 523 (1993). The circuit court had enjoined the construction of a new mental health hospital to replace the Weston State Hospital.[4] Concluding that the circuit court exceeded its authority, the Court held that "[w]here the legislature, through the budget process, expressly provides for funding to build a new public facility, absent some constitutional challenge or an express statutory provision to the contrary, the courts are not authorized to interfere with the legislative mandate." *Matin II*,

---

[4]The circuit court was concerned that the proposed new psychiatric facility would endanger the overall funding of the Behavioral Health System Plan. *Matin II*, 189 W.Va. at 104, 428 S.E.2d at 545.

189 W.Va. at 103, 428 S.E.2d at 524, syl. pt. 1. Thereafter, the William R. Sharpe, Jr. Hospital ("Sharpe") was built. Following additional briefing by the parties regarding whether continued court monitoring was necessary, the Court issued its opinion in *E.H. v. Matin* ("*Matin III*"), 189 W.Va. 445, 432 S.E.2d 207 (1993), retaining the court monitor for at least eighteen additional months, or longer if shown to be necessary.

In 2002, the parties and the circuit court agreed to dissolve the office of the court monitor and removed the case from the circuit court's active docket, although jurisdiction to reopen the case was retained to address various unresolved issues. In fact, the circuit court continued to hold periodic hearings to assess the parties' progress in that regard. Around this same time, the position of "Ombudsman for Behavioral Health" was developed by the DHHR.[5] Regular reports were issued by the Ombudsman to both the circuit court and the DHHR and, in the annual report for 2007-2008, several issues were identified, including those involving the provision and coordination of case management services and the treatment of persons with traumatic brain injuries.

On July 3, 2007, the circuit court adopted and entered the parties' mediated Consent Order on Services To Individuals With Traumatic Brain Injuries. During hearings

---

[5]The Ombudsman served to oversee the DHHR's compliance with its statutory duties relating to the rights of patients confined to state mental health facilities. *See* W.Va. Code § 27-5-9.

held in 2008, the circuit court addressed the continuing problem of the DHHR's compliance

with this consent order. Based upon the significant issues raised in the Ombudsman's

reports, including non-compliance with the consent order and possible violations of West

Virginia Code § 27-5-9, the circuit court entered an order on August 28, 2008, reopening the

case and scheduled an evidentiary hearing.

Thereafter, the DHHR sought a writ of prohibition in this Court to prevent the

lower court from reopening the case. In addressing the DHHR's request for extraordinary

relief, the Court recounted the contents of the July 3, 2008, Ombudsman report that identified

violations of patients' rights that were first identified decades earlier in *Matin I*. The Court

noted that this report detailed

> staff related issues including a practice called "Freezing", in
> which staff members are required to work an additional eight
> hour shift on top of the eight hour shift they have just finished.
> This "Freezing" process is mandatory and those that refuse to
> follow the practice are given written reprimands.[6] The staff also
> stated that the "90 day temp" employee system does not work.
> These 90 day temporary workers are often, if not always,
> unqualified and inexperienced staff assigned to deal with violent
> and aggressive patients. One of these 90 day temporary
> employees was fired for drinking on the job and the regular staff
> generally does not feel comfortable working with them.

---

[6]As discussed, *infra*, the refusal of mandatory overtime can be a basis for termination
of employment, according to evidence presented during the hearings held before the lower
court in April 2014.

*Matin v. Bloom* ("*Matin IV*"), 223 W.Va. 379, 383-84, 674 S.E.2d 244-45 (2009) (footnote omitted) and (footnote added). In summarizing the situation existing then, the Court stated that

> [i]n general, the portrait that emerges from the Ombudsman's reports is that of a hospital that is overcrowded with patients, most of whom are frustrated by living on top of each other, being denied privacy and not having daily access to basic grooming needs. *The regular staff suffers from extremely low morale due to forced overtime and working with unqualified temporary workers with questionable backgrounds.* Specifically, the term 'Dickensian Squalor' that Justice Neely used to describe the hospital in 1981 is an apt description of the hospital that emerges from the Ombudsman's July 3, 2008 report.

*Id.*, 223 W.Va. at 384, 674 S.E.2d at 245 (emphasis added). The Court refused to issue the writ on the grounds that the circuit court had "the power to ensure that patients are receiving the treatment guaranteed to them under W.Va. Code § 27-5-9[,]" as well as the "power to enforce a Consent Order it previously issued." *See id.* at 381; 674 S.E.2d at 242.

Following *Matin IV*, the circuit court held an evidentiary hearing in April 2009. Dr. Shahid Masood, the clinical director at Bateman, testified that staffing vacancies were causing unsustainable working hours for clinical staff; that use of temporary employees was an inefficient use of resources because "by the time they are trained[,] it is time for them to leave[;]" and that increasing salaries would be an "extremely effective" method for recruiting additional full-time employees. Dr. Masood further testified that patients were

6

being administered increased amounts of medication, a side effect of which is sedation, to treat their increased levels of anxiety attributable to understaffing and patient overcrowding.

During this same hearing, the chief executive officer for Bateman at that time, Mary Beth Carlisle, testified that "consistent vacancies in nursing and in direct care" at the hospital necessitated the use of employee overtime and the employment of temporary staff. She agreed and/or suggested that increasing staff salaries to the local prevailing wage, increasing the number of full-time employees, discontinuing the use of ninety-day temporary employees, and eliminating mandatory overtime could all aid in improving the staffing problems. Ms. Carlisle indicated that patients were not receiving community integration trips as required by West Virginia C.S.R. § 64-59-14.4[7] due to the chronic vacancies in direct care positions. Other evidence showed that the DHHR's failure to reimburse community service

---

[7]West Virginia C.S.R. § 64-59-14.4 provides, as follows:

> 14.4. Community Integration. Unless specifically contraindicated by a client's interdisciplinary program plan or physician, each client, other than acute psychiatric and out-of-contact geriatric clients, shall be provided the opportunity to:
> 14.4.1. Shop in the community at least monthly;
> 14.4.2. Eat in a public place in the community at least monthly;
> 14.4.3. Participate in a major recreational activity in the community at least monthly;
> 14.4.4. Attend a public event in the community at least four (4) times annually;
> 14.4.5. Worship in the community on a regular basis; and
> 14.4.6. Visit the local public library on a regular basis.

7

providers resulted in decreased community-based services, including day treatment, which contributes to patient overcrowding.

Based on the evidence presented during the April 2009 evidentiary hearing, the circuit court directed the parties to participate in mediation, which resulted in agreements that were memorialized in an Agreed Order entered by the circuit court on July 2, 2009 (the "2009 Agreed Order"). This order provided, in part, as follows:

> 10. <u>Facilities</u>:
>
> (a) DHHR shall provide for increased pay for direct care workers at Bateman and Sharpe in order to (i) be able to recruit staff and retain existing staff and (ii) preclude the practices of mandatory overtime and reliance on temporary workers (except in exceptional and infrequent contexts). (<u>See</u> Attachment B.)
>
> (b) DHHR will use only full time employees working regular shifts or voluntary overtime except in exceptional and infrequent contexts.

Attachment B, which is a part of the 2009 Agreed Order, is a chart setting forth the various classifications of direct care employees, the number of employees for each classification, the salary increase for each classification, and the total funding necessary for the DHHR to implement the increase. The direct care positions designated to receive increased compensation were psychiatrists, seven different nursing classifications, as well as Health Service Trainees ("HSTs"), Health Service Workers ("HSWs"), and Health Service Assistants ("HSAs"), all of which have responsibilities similar to those of a nurse's aide. In

8

addition to the 2009 Agreed Order, the circuit court entered an order on August 7, 2009,[8] in

which it concluded that

> [w]ithout the provision of community services, Bateman and Sharpe Hospitals will continue to suffer from overcrowding and violations of patients' rights established by W.Va. Code § 27-5-9 will continue to occur. . . . The evidence presented reflects that clients' rights are being violated because individuals are being kept in inpatient, locked institutional facilities, despite readiness for discharge into the community, based on the lack of community services.[9]  (Footnote added).

During an extraordinary session of the Legislature held in 2009, West Virginia

Code § 5-5-4a was enacted.  This statute provides, in part, as follows:

> (a) The Legislature finds that Mildred Mitchell-Bateman Hospital and William R. Sharpe, Jr. Hospital have extreme difficulty in recruiting and retaining physicians, physician specialists, nurses, nursing directors, health service workers, health service assistants, health service associates and other employees who assist in the direct provision of medical care to patients in those facilities.

---

[8]In this same order, the circuit court found that the DHHR had violated consent orders entered in 2001 and 2007 by failing to make "good faith efforts" to secure funding for a Medicaid Traumatic Brain Injury ("TBI") Waiver, failing to apply for that waiver, and failing to develop a dedicated source of state funding for TBI services.  Accordingly, the circuit court ordered the DHHR to apply to the federal government to obtain a TBI Medicaid waiver by January 2010 and to request that the Legislature establish a TBI trust fund to meet additional unfulfilled needs.  The DHHR appealed the circuit court's order, arguing that the lower court had usurped its authority and violated the separation of powers doctrine.  In *E.H. v. Matin*, No. 35505 (W.Va. Sup. Ct. Apr. 1, 2011) (Memorandum Decision) ("*Matin V*"), we concluded that the separation of powers doctrine was not implicated because the case involved the enforcement of prior consent orders to which the DHHR had been party.

[9]This language was quoted in the circuit court's order entered June 27, 2014.

(b) The West Virginia Division of Personnel and the Department of Health and Human Resources jointly *shall develop pay rates and employment requirements to support the recruitment and retention* of physicians, physician specialists, nurses, nursing directors, health service workers, health service assistants, health service associates or other positions at Mildred Mitchell-Bateman Hospital and William R. Sharpe, Jr. Hospital. Pay rates shall reflect the *regional* market rates for relevant positions . . . .

(c) Funding for the pay rates and employment requirements shall be provided from the appropriation to the Department of Health and Human Resources . . . .

W.Va. Code § 5-5-4a (emphasis added).

Following an evidentiary hearing held before the circuit court in July 2011, the court found that Bateman and Sharpe continued to have staffing vacancies and continued to use voluntary and mandatory overtime "to maintain a minimum level of staffing[.]"[10] The circuit court further found that both hospitals continued to be overcrowded, causing patients to be housed on temporary cots in small, windowless classrooms with no access to bathrooms or closets, and that "[o]vercrowding of the state psychiatric facilities continues to violate state law, regulations, and the Orders entered in this case." Five months later, the circuit court received evidence indicating that between January and November of 2011, Bateman averaged twenty-eight vacancies in direct care positions on any given day. Similarly, Sharpe

---

[10]These findings were made in the circuit court's order entered August 19, 2011.

10

had persistent vacancies in direct care workers during this same time period and had required approximately 40,000 hours of overtime from its direct care staff.

On August 29, 2012, the respondents filed a request for resolution seeking enforcement of the DHHR's increased salary commitments as set forth in the 2009 Agreed Order. Evidence presented during a hearing held on October 12, 2012, demonstrated that the DHHR had increased salaries for registered nurses and psychiatrists at or above the amounts set forth in the 2009 Agreed Order and had implemented special hiring rates for these classifications to aid in recruiting new employees. However, Victoria Jones, then-acting Commissioner for the Bureau of Behavioral Health and Health Facilities, testified that the other categories of health service employees had **not** received the pay increases required under the 2009 Agreed Order.[11] Consequently, by order entered December 11, 2012, the circuit directed the DHHR to comply with paragraph 10(a) of the 2009 Agreed Order

---

[11]During the October 2012 hearing, Ms. Jones testified that minutes from a meeting with the court monitor reflected the DHHR's compliance with the 2009 Agreed Order. The circuit court judge interjected, noting that regardless of what persons may or may not have correctly or incorrectly represented during an administrative meeting, the DHHR had just conceded that it was not compliant with the 2009 Agreed Order. Other evidence presented at this hearing showed that the DHHR had worked with the West Virginia Division of Personnel and the Legislature to establish a three percent raise for those health service employees who had been in their positions for three years or longer, effective July 1, 2010. For those who qualified, this three percent raise was far less than what was required under the 2009 Agreed Order. Direct care workers employed less than three years received no raise. Ms. Jones testified at a subsequent hearing that the DHHR eliminated this three percent retention incentive after the circuit court directed its compliance with the salary increases set forth in the 2009 Agreed Order in orders entered on December 11 and 18, 2012.

increasing the compensation for the direct care positions at Bateman and Sharpe by no later than January 1, 2013, in the amounts set forth in Attachment B to the 2009 Agreed Order.[12] The circuit court subsequently denied the DHHR's motion to alter or amend judgment, finding in its December 18, 2012, order that "employees in the LPN and Health Service Trainees, Workers, and Assistants classifications employed on or after January 1, 2013, are entitled to pay raises . . . as provided in the Order entered December 11, 2012."

The current appeal arises out of concerns raised by the respondents during the Fall of 2013 and the Spring of 2014 regarding the DHHR's noncompliance with prior orders and commitments. In their requests for resolution filed in the circuit court, the respondents cited, *inter alia*, an increase in staffing vacancies at Sharpe and Bateman and its corresponding adverse impact on patient care. On April 24 and 29, 2014, the circuit court held evidentiary hearings to address these issues.

The circuit court heard testimony regarding the adverse impact that the hospitals' staffing shortages were having on employees and patient care. A direct care employee at Bateman testified that an employee's refusal of overtime could be a basis for termination and that requiring employees to work consecutive twelve- to sixteen-hour shifts

---

[12]The circuit court did not require retroactive compensation.

12

affects staff morale. As a result, patient care is adversely impacted when the employees work at less than their full capabilities.[13]

Craig Richards, the chief executive officer at Bateman, testified that substantial amounts of money are being paid for the significant overtime that is routinely being required of direct care employees. Mr. Richards agreed that Bateman is "habitually short of staff,"[14] explaining that recruiting efforts do not produce a sufficient number of qualified candidates. He added that the DHHR ultimately expends far more funds for contract workers from out-of-state agencies than what it would cost to hire full-time, permanent employees with benefits.[15] Failing to offer a competitive salary in the market place was identified by Mr. Richards as the primary reason for the staffing issues,[16] although he added that the inability to offer "flexibility in terms of the availability of different [work] schedules" for employees

---

[13]There was also testimony indicating that during a three-month period in 2014 at Sharpe, 3,000 to 4,000 hours of overtime were worked each month in each unit of the hospital.

[14]DHHR documents show that Bateman and Sharpe averaged between forty and forty-eight vacancies in the direct care employee classifications during February and March 2014.

[15]The record reflects the DHHR is paying out-of-state contracting agencies millions of dollars to employ short-term contract workers. These workers typically work five months, one of which is spent in training. The need to train these contract workers further impacts the staffing situation by removing employees from their regular duties.

[16]The circuit court heard this same testimony in 2009 when Bateman's clinical director testified that increasing salaries would be an "extremely effective" method for recruiting additional employees.

13

had a negative effect on hiring. After acknowledging that policies and procedures allow for proposals to be made to the West Virginia Division of Personnel ("DOP") to be able to offer raises and flexible work schedules,[17] Mr. Richards conceded during the April 2014 hearing that the DHHR had not made any such proposals to the DOP.

Regarding the community integration required under West Virginia Code of State Regulations § 64-59-14.4, both Mr. Richards and Commissioner Victoria Jones[18] testified that this requirement was not being met due to lack of staff.[19] Consistent with Mr. Richards' testimony, Ms. Jones agreed that the DHHR's cost for contract workers is significantly higher than what it would expend on full-time employees in the same positions. She further testified that the DHHR "failed to implement the [2009] Agreed Order[;]" had not taken any action on the health service worker classifications to keep the DHHR in compliance with either the 2009 Agreed Order or West Virginia Code § 5-5-4a; and had not conducted any salary analysis since 2009. According to Ms. Jones's testimony, the DHHR

[17]Mr. Richards testified that Bateman must maintain compliance with DOP policies and rules in relation to the hiring process. Although he was aware of DOP's open fora during which the DHHR could make suggestions or requests of the DOP in order to meet patient obligations, he had never participated.

[18]At the time of this hearing, Ms. Jones had become the commissioner for the Bureau of Behavioral Health and Health Facilities, rather than its acting-commissioner.

[19]Mr. Richards testified that the staff position responsible for coordinating community integration had been vacant since April 2012, and that community integration was being overseen by the hospital's clinical director. It appears that sometime after the April 2014 hearing, a person was hired for the position in charge of community integration.

had not requested either hiring incentives or special hiring rates from the DOP for the direct care employees during the last four years, other than for nursing classifications, and perhaps psychiatrists, even though the DHHR has the ability to seek "step rate" increases or wage increases from the DOP within budgetary allocations. While agreeing that all direct care classifications at Bateman and Sharpe are not competitive, Commissioner Jones viewed competitive salaries as a temporary solution to the chronic recruitment and retention issues, suggesting that the use of sick and annual leave and attendance issues need to be addressed at the policy level.

Based upon all of the evidence received, the circuit court entered an order on June 3, 2014,[20] in which it observed that many of the problems that existed in 2009 continued to exist in 2014. The circuit court noted that Bateman and Sharpe continue to require direct care workers to perform significant, routine, and consistent amounts of mandatory overtime, in addition to voluntary overtime, due to the persistent and chronic understaffing issues; that the refusal of mandatory overtime can be a basis for termination; that some direct care employees are required to work "twelve to sixteen hour shifts, two to three days in a row";

---

[20]The parties refer to this order as having been entered on June 2, 2014. This order was entered by the circuit court clerk on June 3, 2014, which is the date that will be used by this Court. *See* Syl. Pt. 4, *State v. Mason*, 157 W.Va. 923, 205 S.E.2d 819 (1974) ("In a proceeding governed by the Rules of Civil Procedure, a judgment rendered in such proceeding is not final and effective until entered by the clerk in the civil docket as provided in Rule 58 and Rule 79(a) of the Rules of Civil Procedure.").

15

and that an Executive Summary generated by Sharpe states that "[t]he use of mandatory and voluntary overtime is causing turn-over and morale issues."[21] The circuit court specifically noted that chronic understaffing has meant that patients are unable to access community integration opportunities, which is "an essential component of patient care that ensures that patients do not become institutionalized and are able to reintegrate into a community-based setting as quickly as possible."[22]

Regarding the DHHR's continued failure to offer competitive wages to the direct care workers at Sharpe and Bateman as required by prior orders and West Virginia Code § 5-5-4a, the circuit court found that recruitment of fulltime staff is greatly hindered by the DHHR's internal policies.[23] The circuit court recounted the evidence demonstrating

[21]The circuit court found that "[r]ather than hiring additional full-time employees, the [DHHR] employ[s] large numbers of temporary employees and contract workers to fill the vacancies at Sharpe and Bateman." The circuit court explained that temporary employees, who are also required to work overtime, typically work three to five months, one of which is spent in training. In addition, the circuit court found that the DHHR pays out-of-state contracting agencies millions of dollars each year for contract workers, paying a significantly higher hourly wage than what the DHHR expends on full-time employees in the same direct care positions, even when including benefits.

[22]Specifically, the lower court found that the DHHR had "violated the standards of patient care, as required by West Virginia Code State Regulations sections 64-59-1 to -20 and the 2009 *Agreed Order* paragraph 10(d), by failing to provide community integration activities as required by West Virginia C.S.R. § 64-59-14.4."

[23]DHHR officials testified regarding its internal policy that a new employee's starting salary can never be more than the average salary of other employees in the same positions, regardless of the new hire's experience. Therefore, a salary increase for current employees

(continued...)

16

that Cabell-Huntington Hospital, a regional market competitor to Bateman, pays its similar classes of employees significantly higher starting salaries, a cost of living increase each year, and raises tied to years of service,[24] in addition to conducting an annual review and increase of its average wages.

Rather than the DHHR seeking permission from the DOP to be able to offer special hiring rates, including rates in excess of the "market rate," hiring incentives, and retention incentives,[25] the circuit court further found that the base starting rates for three classes of direct care employees–HSTs, HSWs, and HSAs–were the same as those in effect prior to the 2009 Agreed Order. Consequently, the circuit court concluded that the DHHR was in violation of the 2009 Agreed Order because it had taken "no steps to offer competitive

---

[23](...continued)
raises the average salary, which can mean a higher salary for new hires.

[24]As the circuit court recounted in its order, the evidence showed that in 2013, the six major hospitals in the Huntington, West Virginia, area paid an average hourly wage of $13.34 for a nursing assistant (compared to Bateman's base starting salary of $9.37 per hour for a HSW); $17.06 for an LPN (compared to Bateman's base starting salary of $12.40 per hour); and $27.29 for an RN (compared to Bateman's base starting salary of between $16.47 and $22.03 per hour for its RN classifications).

[25]Various DHHR employees, as well as the assistant director of classification and compensation for the DOP, testified concerning the interaction between the DHHR and the DOP on employment related issues. For example, while the DOP has sole authority to determine employee position classification and the salaries for each pay grade, classification determinations are made with input from the DHHR. Further, the DOP's "pay plan implementation policy" allows the DHHR flexibility in hiring and establishing minimum staring salary rates.

17

market wages in order to recruit and retain full time employees, as required by paragraph 10 of the 2009 *Agreed Order* and West Virginia Code § 5-5-4a." The court further found that the DHHR had failed to comply with the December 18, 2012, Order, which requires a "special starting salary for the three classes of direct care employees, as set forth in Attachment B to the 2009 *Agreed Order*."

Upon concluding that the DHHR's "violation of patient care requirements is caused by the [DHHR's] failure to maintain adequate and appropriate fulltime staffing at [Bateman and Sharpe]," the circuit court directed the DHHR to develop a plan,[26] in consultation with the court monitor and the respondents, that will

> (1) significantly reduce the number of staff vacancies at Sharpe and Bateman, (2) discontinue the practice of mandatory overtime except in exceptional and infrequent contexts; and (3) discontinue the reliance on temporary employees and contract workers to fill the vacant positions. Among other things, the plan should utilize the currently available options, as set forth in the policies of the Division of Personnel, to implement special hiring rates and incentives in order to recruit fulltime direct care employees. In doing so, the [DHHR] shall consider prevailing market wages in the respective market areas for the two Hospitals. The Plan must further include requests to the Division of Personnel for retention incentives to encourage retention of existing hospital employees. The plan must provide a schedule for future proposals to the Division of Personnel to

---

[26]At the conclusion of the April 29, 2014, hearing, the circuit court verbally directed the DHHR to prepare this plan in consultation with the respondents, the Governor's Office and the DOP, warning against a subsequent return to court with a plan requiring legislative approval given its years of delay to act on these matters.

18

> ensure that base salaries remain competitive and that additional
> retention incentives are distributed.

The circuit court further ordered the DHHR to "immediately implement a special starting salary for the three categories of health service workers as reflected in Attachment B to the 2009 *Agreed Order*."[27]  Lastly, the circuit court ordered the DHHR to provide community integration opportunities to all eligible patients at both Sharpe and Bateman and to develop policies and procedures for community integration that adhere to West Virginia C.S.R. § 64-59-14.

On June 11, 2014, the parties appeared before the circuit court during which the DHHR presented three proposals, each requiring years to implement as well as legislative approval.[28]  After hearing the proposed plans, the circuit court held the DHHR in contempt, which finding was confirmed in its June 27, 2014, order.[29]  To purge itself of contempt, the

---

[27]This was also part of the directive in the circuit court's order entered December 18, 2012, which was not appealed.

[28]These three proposals were: (1) privatization of Bateman and Sharpe; (2) a "contracted employee option" where all direct care workers would be contracted out to private companies; and (3) a "hybrid" approach where current employees would be phased in as "classified-exempt." The effect of the hybrid approach would be to remove current employees from civil service classification and the protections afforded by such classification.

[29]In its June 27, 2014, order, the circuit court found that Bateman and Sharpe had "failed to recruit and retain direct care staff, failed to comply with Court *Orders* regarding pay raises for direct care workers, failed to offer community integration services, and have consequently failed to provide adequate direct care to patients at the Hospitals."

19

DHHR had only to present a remedial plan that could be implemented immediately utilizing current DOP policies and procedures.

The DHHR returned to the circuit court on August 1, 2014, for a hearing during which it presented its proposed plan. The plan provided, *inter alia*, for increased salaries for direct care workers at Sharpe and Bateman that are competitive with prevailing market wages in the hospitals' respective geographical areas based upon regional market surveys, and for periodic retention incentives for employees who remain employed in their job classification for three or more years. Commissioner Jones testified that the DHHR could implement its plan using existing DOP policies and procedures, and that nothing in the plan required legislative approval. Monica Robinson, the interim director of the DHHR's Office of Human Resources Management, testified that potential sources of funding for the plan included "various funds . . . within the [DHHR] . . . as controlled by the Secretary" and that if these proved insufficient, the DHHR would seek additional funding from the Legislature.

Near the conclusion of this hearing, the circuit judge commented on the DHHR's proposed plan as being the "appropriate method," adding that

> [i]f there are other solutions that the [DHHR] wishes to proceed
> to look at with the legislature, . . . they are free to do that, but
> that's not to delay or cause any disruption in the implementation
> of this plan until such time as the legislature and executive
> decide some other plan is more appropriate, and then the Court
> will review that based on wherever we are at that time.

20

> . . . this is the plan that you all developed. I don't intend to usurp the authority of the executive or the legislative branch. . . . I want to solve the immediate problem that we have for the care of this very vulnerable population. And moving in the direction as the [DHHR] has outlined appears to be within their means and within their power to begin to move on at a deliberate pace, and I think that solves the problem that I have with the prior plans.

The DHHR's counsel responded that this plan was not preferred by the DHHR, at which point the court reiterated that it was "not foreclosing [the DHHR from] pursuing other plans if that's what you want" but emphasized that "this one needs to be implemented with deliberate speed."

On August 13, 2014, the circuit court entered an order finding the DHHR had purged itself of the contempt "so long as [it] execute[s] [its] proposed plan." In this same order, the circuit court echoed comments it previously expressed during the August 1, 2014, hearing:

> 13. The [DHHR] may wish to pursue other solutions which would require legislation to implement. Nothing in this *Order* or any prior *Orders* of this Court impedes the ability of the Legislature to change the manner in which the Hospitals are operated, nor do the *Orders* prohibit the [DHHR] from seeking such legislative action.

> 14. Until such time as the Legislature changes the law, however, the current plan, which utilizes the current legal structure to address the ongoing violations of the 2009 *Agreed Order*, should be implemented without delay or disruption.

21

Through a second order entered on August 13, 2014, the circuit court refused the DHHR's motion for a stay of the court's orders entered on June 3 and 27, 2014, as well as its oral ruling made during the August 1, 2014, hearing approving the DHHR's proposed plan;[30] it also refused to declare those rulings to be partial final judgments.

The appendix record reflects that additional hearings were held during the Fall of 2014 to monitor the DHHR's progress on its plan, which was approved by the State Personnel Board on October 10, 2014. During the hearing held on October 14, 2014, the DHHR advised that the requisite regional market studies had been completed; that new salary ranges had been established; and that new starting salaries and raises for existing employees were expected to be implemented by January 1, 2015. The DHHR further advised that it anticipates funding for the increased salaries to be obtained, in part, through savings in expenditures currently being paid to short-term contract employees.[31]

The DHHR appeals the circuit court's June 3, 2014, and August 13, 2014, orders.[32] The Court has consolidated these appeals for consideration.

---

[30]The DHHR also sought a stay in this Court, which was refused by order entered on August 26, 2014.

[31]The DHHR again indicated that additional funding could be sought from the Legislature.

[32]Two orders were entered by the circuit court on August 13, 2014. One purged the
(continued...)

22

## II. Standard of Review

In reviewing the challenged orders issued by a lower court, we will review the "ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." Syl. Pt. 4, in part, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996). Under these well-established precepts, we proceed to address the parties' arguments to determine whether the lower court committed error.

## III. Discussion

### A. Appellate Jurisdiction

We first address the parties' arguments regarding the Court's appellate jurisdiction over the rulings subject to this appeal. In one of its August 13, 2014, orders, the circuit court refused to declare its June 3 and 27, 2014, orders as a partial final judgment under Rule 54(b).[33] The lower court similarly ruled with regard to its oral ruling made during the August 1, 2014, hearing, which approved the DHHR's proposed plan for immediate

---

[32](...continued)
DHHR of contempt and confirmed the oral ruling made during the August 1, 2014, hearing approving the DHHR's proposed plan, and the other refused the DHHR's request for a stay and for entry of partial final judgments. Both of these orders are attached to the DHHR's notice of appeal for case number 14-0845.

[33]Rule 54(b) of the West Virginia Rule of Civil Procedure provides, in part, that " the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

23

implementation. The circuit court reasoned that these orders were not final because they continued to address the same problems that had existed since 2009. Both parties offer varying theories under which this Court should exercise its appellate jurisdiction,[34] as the DHHR contends,[35] or should refuse to do so, as the respondents assert.

Although not cited by the parties, in syllabus point five of *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996), we held that

> [a]n order dismissing fewer than all of the parties or fewer than all the claims in a civil action which contains a determination by a circuit court that the order *not* be considered final will be reviewed by this Court only upon application for a writ of prohibition. The party seeking such a writ must show any such abuse clearly and convincingly, because *this Court greatly favors having before it all matters in controversy when reviewing the issues raised before it*.

*Id.* (emphasis added). At first blush, *Riffe* would suggest that we decline to consider the instant appeals because the DHHR should have sought our original jurisdiction by seeking

---

[34]Our appellate jurisdiction extends to "civil cases at law where the matter in controversy, exclusive of interest and costs, is of greater value or amount than three hundred dollars" and we "shall have such other appellate jurisdiction, in both civil and criminal cases, as may be prescribed by law." W.Va. Const. art. VIII, § 3; *see also* W.Va. Code § 51-1-3 (2008) ("[the Supreme Court of Appeals] shall have appellate jurisdiction in civil cases where the matter in controversy, exclusive of costs, is of greater value or amount than one hundred dollars" as well as "such other appellate jurisdiction . . . as may be prescribed by law.").

[35]One of the theories offered by the DHHR in support of our appellate jurisdiction is the collateral order doctrine. We find that this doctrine cannot be applied because the orders on appeal do not resolve issues that are "completely separate from the merits of the action." *Credit Acceptance Corp. v. Front*, 231 W.Va. 518, 523, 745 S.E.2d 556, 561 (2013).

extraordinary relief in prohibition. While we could consider these appeals as seeking relief

in prohibition, as we have done in other matters,[36] we find that course of action unnecessary

for the reasons set forth below.

The case at bar is distinct from the personal injury action in *Riffe*,[37] or any other

civil action, where the litigation is likely to reach its finality within an indefinite, but

generally reasonable amount of time. In contrast to the typical litigation matter such as that

involved in *Riffe*, it is essentially impossible for this Court, or even the lower court, to have

"all matters in controversy when reviewing the issues raised before it" in the context of this

institutional-centered litigation. Moreover, unlike a typical civil action, institutional reform

litigation involves court orders requiring prospective action by the government.

The institutional reform undertaken in the case at bar has been, and is being,

achieved through the circuit court's entry of a variety of orders over the course of decades.

As reflected in the procedural history set forth above, we have already reviewed numerous

---

[36]*See State ex rel. Register-Herald v. Canterbury*, 192 W.Va. 18, 19 n.1, 449 S.E.2d 272, 273 n.1 (1994) ("In this case, it is logical to treat the appeal . . . as a prohibition. . . .").

[37]Although the claims asserted in *Riffe* arose in the context of an involuntary commitment, it was a civil action seeking damages for false imprisonment and for medical malpractice arising out of a physician's certificate for the involuntary commitment proceedings.

orders entered in this matter.[38] Most recently, we ruled on the DHHR's appeal in *Matin V*, notwithstanding the absence of any language expressly providing that the order at issue was a "final" ruling. Because the process of formulating and implementing various remedies in this proceeding has required extraordinary expenditures of time and funds by the parties; the circuit court; and this Court, we must necessarily assume a practical approach to our appellate jurisdiction. At the same time, we must act in recognition of the circuit court's discretion to ensure efficient judicial administration and justice for the parties. During the pendency of this litigation, the circuit court has clearly gained an intimate understanding of the parties, the subject hospitals, and the changes required to achieve the goals initially identified in *Matin I* and the litany of commitments made by the DHHR through the 2009 Agreed Order.

Certainly, we do not intend to exercise our appellate jurisdiction over every order entered in this matter. Nonetheless, this Court must be able to review orders that are properly demonstrated to have the necessary degree of finality in the context of this long-standing institutional reform litigation to warrant review, and certainly those which necessitate the expenditure of significant state monies. Otherwise, a state agency may be denied timely appellate review. As we have previously explained, where "an order . . .

---

[38]Similarly, we reviewed various circuit court orders over a period of years in the long-term prison reform litigation that began with *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986).

26

completely disposes of any issues of liability . . . the absence of language prescribed by Rule 54(b) . . .'directi[ng] . . . entry of judgment' will not . . . bar appeal provided that this Court can determine from the order that the trial court's ruling approximates a final order in its nature and effect." Syl. Pt. 2, in part, *Durm v. Heck's, Inc.*, 184 W.Va. 562, 401 S.E.2d 908 (1991). Accordingly, we now hold that in the context of institutional reform litigation, this Court may choose to exercise its appellate jurisdiction over an order entered by the circuit court that it deems to approximate a final order by its nature and effect.

The record reflects that subsequent orders have been entered with regard to the DHHR's progress on implementing its plan, and that further rulings are contemplated. Notwithstanding the possibility of subsequent decrees, we find that the orders being appealed establish responsibility on the DHHR for a remedy that requires administrative action and the expenditure of significant funds to meet obligations ineluctably established by prior orders, statutes, and regulations. Accordingly, we conclude that the DHHR has demonstrated that appellate review is warranted; therefore, we reverse the circuit court's August 13, 2014, order to the extent it refused to certify its prior rulings on appeal as partial final judgments.

## B.  Separation of Powers

In the current consolidated appeals, the DHHR argues, as it has in prior appeals, that the circuit court wrongly decided questions entrusted to the legislative and

27

executive branches. Specifically, the DHHR argues that the "parameters" set by the lower court for the DHHR's plan required more than working towards a reduction in the use of overtime and temporary employees, as contemplated under paragraph 10(b) of the 2009 Agreed Order.[39] Instead, the DHHR contends that the lower court directed it to increase the pay of direct care workers to market rates and to "restructure"[40] employee salaries and job classifications, without providing it with an opportunity to develop any necessary, remedial plan to solve overtime and permanent staffing issues. Citing various institutional reform cases, including *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971), the DHHR asserts that a court can devise its own plan in institutional reform cases *only* if the executive branch agency has been given multiple opportunities to devise a plan or mechanism to correct its past violations in prisons, schools, and other state-operated facilities. The DHHR adds that whether the plan currently being implemented is better than the proposals it made during the June 11, 2014, hearing is irrelevant because where there is a good faith difference of opinion, "differences should be resolved by the direction of the [DHHR] and not by the courts." *Matin I*, 168 W.Va. at 259-60, 284 S.E.2d at 238.

Given the DHHR's admitted failure to comply fully with either the 2009 Agreed Order or the December 18, 2012, order, the respondents argue that the circuit court

---

[39]Paragraph 10(b) provides that the "DHHR will use only full time employees working regular shifts or voluntary overtime except in exceptional and infrequent contexts."

[40]This term is used by the DHHR; it is not included in the circuit court's order.

28

had the authority to act, just as it did regarding the implementation of a TBI Medicaid waiver program and trust fund in *Matin V.*[41] The respondents emphasize that despite the DHHR's agreed upon commitments made in 2009 to discontinue its use of mandatory overtime and temporary workers, as well as its agreement that the best way to meet that commitment was through competitive salaries realized through wage increases, it failed to honor either of these obligations. The respondents cite evidence in the record demonstrating how DOP policies and procedures could be used to correct these problems and how the DHHR admittedly made no effort to work with the DOP to achieve these objectives.[42] Upon receiving all of this evidence, the respondents assert that rather than mandating a specific remedy, the circuit court simply ordered the DHHR to develop a plan to ensure compliance with its prior agreements and the law. Because increased salaries were again cited by the parties during the April 2014 hearings as a solution to employee recruitment and retention issues, the respondents argue that the circuit court's guidance in this regard was appropriate and did not encroach on the authority of either the executive or the legislative branch. In particular, the respondents note that the circuit court made clear that none of its orders preclude the DHHR from working with the Legislature to develop a different plan for the court's consideration.

---

[41]*See supra* note 8.

[42]There was evidence that through the DHHR's efforts with the DOP, the salaries of RNs and psychiatrists at Bateman and Sharpe were increased to rates that actually exceeded what was required under the 2009 Agreed Order. However, the DHHR did not work with DOP to raise the salary rates for the other direct care workers–the HSTs, HSWs, and HSAs–as required under the 2009 Agreed Order.

29

In addressing the parties' arguments, we first observe that the separation of powers doctrine states, in part, that "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time[.]" W.Va. Const. art. V, § 1. As we concluded in *Matin I*, *IV*, and *V* and as discussed below, we again find that this doctrine is not implicated in the instant appeals.

In *Matin IV*, we found that "[t]he regular staff suffers from extremely low morale due to forced overtime and working with unqualified temporary workers with questionable backgrounds." *Matin IV*, 223 W.Va. at 384, 674 S.E.2d at 245. We further observed that "many of the same issues that were present in 1981 at the time of the *Matin I* decision continue to be problems today, according to the Ombudsman's report. . . . includ[ing] . . . the numerous staffing issues . . . ." *Id.* at 285, 674 S.E.2d at 246. We also observed that "the term 'Dickensian Squalor' . . . used to describe the hospital in 1981 [was] an apt description . . . that emerges from the Ombudsman's July 3, 2008 report." *Id.* Thereafter, the parties were directed to participate in mediation that resulted in several agreements, subsequently memorialized in the 2009 Agreed Order.

Despite the 2009 Agreed Order, the DHHR exhibited an extraordinary lack of initiative to oversee that its commitments were met. Had it actually undertaken to develop

30

a formal plan of action in 2009, there would likely have been no need for the parties' return

to the circuit court in 2014 on these very same issues. Indeed, the circuit court's frustration

with the DHHR was surely exacerbated upon learning of the DOP policies and procedures

that could aid the DHHR in achieving compliance—tools that were untouched during the

intervening years.[43]

Compelling the DHHR to develop a plan to meet its previous commitments and

the law, after years of delay, does not demonstrate an encroachment on executive branch

authority. Instead, it supports the DHHR's decision to enter into the contractually binding

2009 Agreed Order. Given the DHHR's failure to correct problems that have existed for

more than thirty years, the institutional reform cases cited by the DHHR[44] would arguably

support the circuit court crafting a plan for the DHHR's implementation. Nonetheless, the

lower court's June 3, 2014, order directed the DHHR to develop a plan to "(1) significantly

reduce the number of staff vacancies at Sharpe and Bateman, (2) discontinue the practice of

mandatory overtime except in exceptional and infrequent contexts; and (3) discontinue the

reliance on temporary employees and contract workers to fill the vacant positions." What

cannot be overlooked is the fact that the DHHR had already committed itself to accomplish

---

[43]Again, the DHHR worked with the DOP to raise the salaries for RNs and psychiatrists pursuant to the 2009 Agreed Order, including special hiring rates, but not for the other direct care worker classifications.

[44]*See*, *e.g.*, *Swann*, *supra.*

each of these goals during the mediation, as reflected in the 2009 Agreed Order.  The circuit court also mandated the DHHR to "consider prevailing market wages in the respective market areas for the two Hospitals."   This requirement, along with the "special hiring rates and incentives" for the direct care workers, were clearly intended to bring the DHHR into compliance with prior orders, as well as West Virginia Code § 5-5-4a.[45]  Given the stark absence of any constructive planning to date, let alone any demonstration of long-range planning efforts, the circuit court reasonably acted within its discretion by directing the DHHR to create a schedule for future proposals to the DOP to ensure that base salaries remain competitive and that additional retention incentives are distributed[46] to remain compliant with agreed to commitments, prior orders, and statutory obligations.

---

[45]As indicated previously, the Legislature expressly recognized in this statute the "extreme difficulty" that Sharpe and Bateman have in recruiting and retaining direct care workers; mandated the DHHR and the DOP to develop "pay rates and employment requirements to support the recruitment and retention" of psychiatrists, nurses, HSTs, HSWs, HSAs, or other positions at Bateman and Sharpe; and required those pay rates to reflect "regional market rates for relevant positions." W.Va. Code § 5-5-4a.

[46]The DHHR asserts that West Virginia Code § 5-5-4a does not create a continuing obligation to keep pay rates in line with regional market rates for the direct care employees at the subject hospitals.  We find no language in that statute supports this argument.  *See Martin v. Randolph Cty. Bd. of Educ.*, 195 W.Va. 297, 312, 465 S.E.2d 399, 414 (1995), quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("'[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.'").  Moreover, it is unclear how the DHHR believes that its chronic staffing issues can be resolved on a long-term basis without competitive pay rates.

Based on our review, the only "new" directive included in the June 3, 2014, order is the requirement that the DHHR comply with its earlier agreements by utilizing methods and procedures previously established by the legislative and executive branches to address the personnel problems at Bateman and Sharpe. *See* W.Va. Code § 5-5-4a; W.Va. Code §§ 29-6-1 to -28 (establishing civil service system and requiring DOP to create system of classification and compensation for civil service employees); W.Va. C.S.R. §§ 143-1-1 to -26 (adopting DOP rules for purpose of implementing W.Va. Code §§ 29-6-1 to -28.). Consequently, we find this requirement to be well within the circuit court's authority considering the DHHR's prior unfulfilled agreements, the pertinent statutory and regulatory mandates discussed herein, and the continued adverse impact that the DHHR's delay has had on patient care.[47]

That the DHHR can be compelled to act in accordance with its prior agreements, as well as prior court orders, is beyond dispute. *See Matin IV*, 223 W.Va. at 381, 674 S.E.2d at 242 ("The circuit court . . . has the power to enforce a Consent Order it

---

[47]As indicated above, Bateman's clinical director testified in 2009 that patients were being administered increased amounts of medication, a side effect of which is sedation, to treat their increased levels of anxiety attributable to understaffing and patient overcrowding. In 2014, the chief executive officer at Bateman could not "rule out" the possibility that patients were continuing to be sedated for these same reasons. The patient overcrowding is partially attributable to the failure to provide patients with the community integration services required under West Virginia C.S.R. § 64-59-14.4. The evidence showed that patients were not being evaluated to determine whether they would be eligible to receive community integration services because no such services were planned due to the chronic understaffing.

33

previously issued."). Furthermore, "a trial court always has inherent authority to regulate and control the proceedings before it and to protect the integrity of the judicial system." *Clark v. Druckman*, 218 W.Va. 427, 435, 624 S.E.2d 864, 872 (2005); *see also Beto v. Stewart*, 213 W.Va. 355, 362, 582 S.E.2d 802, 809 (2003), quoting *Bartles v. Hinkle*, 196 W.Va. 381, 389, 427 S.E.2d 827, 835 (1996) ("[A] trial court has broad authority to enforce its orders . . . ."). Indeed, it is axiomatic that a circuit court has the inherent power to do those things necessary to compel a party's compliance with prior agreements, to enforce its prior orders, and to protect the court from acts obstructing the administration of justice, including the use of its contempt powers.

The instant, and prior, appeals in this litigation depict an agency that is either well-intended, or one that makes agreements as the exigencies demand; in either case, its follow-through efforts are abysmal. The DHHR's pattern of failing to fulfill its commitments and obligations undermines the efficacy of such agreements and further serves to discourage negotiation-based resolution. Despite being held in contempt for its failure to develop a plan for immediate implementation after years of noncompliance, the DHHR continues to assert that the plan it developed was offered only to purge the contempt, but it was not its preferred course of action.[48] Certainly, the executive branch should lead reform efforts, but courts are

---

[48]The appendix record reflects that all parties agreed in 2009, 2012, and 2014 that offering competitive market rate salaries to direct care workers would aid in correcting the chronic staffing issues. While there was some testimony from the DHHR suggesting that the
(continued...)

34

by necessity required to intervene when those efforts fall short. *See*, *e.g., State ex rel. Smith v. Skaff*, 187 W.Va. 651, 655, 420 S.E.2d 922, 926 (1992) (directing Division of Corrections to develop plan to provide "some temporary arrangement to meet its obligation to house and detain all those lawfully sentenced to a state penal facility until such time as the new prison [the Mt. Olive Correctional Complex] is completed."); *Crain v. Bordenkircher*, 180 W.Va. 246, 248, 376 S.E.2d 140, 142 (1988) (addressing prior rulings that conditions of confinement violated constitutional prohibition against cruel and unusual punishment and concluding that if Court failed to act "after more than eight years of waiting for the legislative and executive branches to act to solve the problem, we would be abdicating our responsibility to uphold and guard the Constitutions of the United States and West Virginia[;]" and compelling construction of new prison by July 1, 1992); *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986) (finding Department of Corrections' compliance plan devised under consent decree to be inadequate and ordering future remedial

---

[48](...continued)
state's leave policies also contribute to the staffing problems, favorable leave policies could arguably be used by the DHHR as an additional recruitment incentive. Moreover, the problem appears not to be the leave policies, per se, but the pervasive and routine use of mandatory overtime due to habitual understaffing. Even the DHHR agrees that mandatory overtime is harming employee morale; is contributing to employee turnover; and is probably causing employees to use their leave to avoid being required to work a sixteen-hour, rather than a scheduled eight-hour, work day. If recruitment of individuals for permanent direct care positions can be achieved through competitive market salaries, and perhaps favorable leave policies, as well, then the need for temporary and contract workers, as well as mandatory overtime, would be reduced to "exceptional and infrequent contexts."

action by directing Department of Corrections to revise its compliance plan to include development of new facilities).

In the case at bar, the DHHR seemingly ignores the fact that when it appeared before the circuit court in 2014, five years had elapsed during which it essentially sat idle. It certainly had not formulated any concrete plan to meet its commitments and other court-ordered, regulatory, and statutory obligations. Although the circuit court certainly made clear that the DHHR could move forward with developing another plan for the court's consideration, either with or without legislative involvement, it made equally clear that additional years of noncompliance would not be condoned. We agree.

It is both inexcusable and disheartening for the DHHR to be before this Court on some of the same issues that were identified more than thirty years ago—issues that continue to adversely impact the very vulnerable patient population committed to our state mental health hospitals. "[W]hen the executive persists in indifference to, or neglect or disobedience of court orders . . . it is the executive that could more properly be charged with contemning the separation principle." *Perez v. Boston Housing Auth.*, 400 N.E.2d 1231, 1252 (Mass. 1980). Consequently, we are compelled to find that requiring the DHHR to develop a plan for immediate implementation, which would allow it to comply with court-ordered, statutory, and regulatory obligations–obligations previously consented to by the

DHHR–does not transform the DHHR's plan into the circuit court's plan. Neither does it violate the separation of powers doctrine.

### C. Paragraph 10(a) of the 2009 Agreed Order

Paragraph 10(a) of the 2009 Agreed Order states, in part, that the "*DHHR shall provide for increased pay* for direct care workers at Bateman and Sharpe *in order to (i) be able to **recruit staff*** and retain existing staff . . . ." (emphasis added.). The DHHR argues that it did not view paragraph 10(a) as contemplating increased staring salaries for future hires in direct care positions; rather, this language only applied to increased salaries for existing employees. To the extent there is any doubt as to the meaning of paragraph 10(a), the DHHR asserts that constitutional considerations require resolution in its favor. The DHHR adds that requiring the state to expend additional funds not previously approved or anticipated raises questions concerning the circuit court's power to limit the Legislature's authority over the DHHR's budget.

The respondents argue that the circuit court's unappealed order entered December 18, 2012, settled any issue as to whether increased salaries for new employees was required. The respondents assert that the lower court compelled the DHHR's compliance with the 2009 Agreed Order in its December 18 ruling by ordering that HSTs, HSWs, HSAs,

37

and LPNs employed "on or after January 1, 2013" were entitled to pay raises. Because this language clearly contemplates new employees, the respondents maintain the issue is moot.

The DHHR's extreme difficulty in recruiting persons to permanent positions at Bateman and Sharpe is undisputed.[49] Consequently, the DHHR's argument that paragraph 10(a) does not require it to increase base salaries for new employees is simply unsupportable when considering the impetus behind both the 2009 Agreed Order and West Virginia Code § 5-5-4a. Testimony offered by the DHHR during the hearings held in 2009, 2012, and 2014 clearly demonstrated a unanimous belief that increasing salaries would aid in employee *recruitment*, as well as retention.

The plain language of paragraph 10(a) of the 2009 Agreed Order expressly requires the DHHR to increase pay for direct care workers in order to "be able to recruit staff[.]" By common definition, "recruit" means to "enroll (someone) as a . . . worker in an organization,"[50] or to "secure the services of: engage, hire."[51] Further, West Virginia Code

---

[49]The appendix record reflects that when a DHHR official was questioned concerning the recruitment tools currently being utilized to attract employees, he responded by reciting traditional methods, such as advertising, attending employment fairs, and maintaining relationships with schools. The circuit court noted that these were the same tools being used when the parties were before the court in 2009.

[50]*See* New Oxford American Dictionary 1460 (3rd ed. 2010).

[51]*See* Merriam-Webster's Collegiate Dictionary 1041 (11th ed. 2005).

§ 5-5-4a provides that the DHHR, in conjunction with the DOP, "*shall* develop pay rates and employment requirements to support the *recruitment* and retention of" direct care workers at Bateman and Sharp. *Id.* (emphasis added). It is axiomatic that "the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syl. Pt. 1, *Nelson v. West Virginia Pub. Employees Ins. Bd.*, 171 W.Va. 445, 300 S.E.2d 86 (1982).

Consequently, we find no merit to the DHHR's argument that paragraph 10(a) of the 2009 Agreed Order did not contemplate an increased salary rate for new direct care employees. Further, we agree with the respondents that to the extent the DHHR had any doubt in that regard, it was resolved and clarified through the circuit court's order entered December 18, 2012,[52] stating: "employees in the LPN and Health Service Trainees, Workers, and Assistants classifications employed on or after January 1, 2013, are entitled to pay raises . . . as provided for in the Order entered December 11, 2012." Evidence presented during the April 2014 hearings indicated that the DHHR provided the required raises to those employed on January 1, 2013, but failed to increase the starting salaries for those individuals hired after that date.

---

[52]The DHHR conceded during a hearing held in October of 2012 that the HSTs, HSWs, and HSAs did **not** receive the salary increases required under the 2009 Agreed Order.

Notwithstanding the DHHR's clear obligations under the 2009 Agreed Order, the December 2012 orders, and West Virginia Code § 5-5-4a, the evidence demonstrated that in 2014, the base starting salaries for the HSTs, HSWs, and HSAs remain at the same rates in effect prior to the 2009 Agreed Order. Consequently, we find that the circuit court did not abuse its discretion by compelling the DHHR to develop a plan that included the means to accomplish what it agreed to do five years earlier: increase salaries of direct care workers at Bateman and Sharpe in order to be able to recruit staff and retain existing staff and eliminate the pervasive and excessive use of mandatory overtime and temporary workers.[53] *See Matin IV*, 223 W.Va. at 381, 674 S.E.2d at 242 ("The circuit court also has the power to enforce a Consent Order it previously issued."); Syl. Pt. 1, in part, *Seal v. Gwinn*, 119 W.Va. 19, 191 S.E. 860 (1937) (" A court may . . . enter such orders and decrees as may be necessary to enforce [prior] decrees[.]").

Turning to the DHHR's budgetary argument, as we explained in *Matin I*, "[w]hen the Legislature enacts a law giving a group of individuals a clear and explicit right, there is also created an implicit corresponding duty on the part of the State to grant or enforce that right." *Matin I*, 168 W.Va. at 257, 284 S.E.2d at 237. Indeed, "[i]nherent in the republican form of government established by our State Constitution is a concept of due process that insures that the people receive the benefit of legislative enactments." Syl. Pt.

[53]Under West Virginia Code § 5-5-4a, the salaries of direct care workers at Bateman and Sharpe must be at "regional market rates."

40

1, *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1982). Consequently, "[a] legislatively conferred right is an entitlement that cannot be arbitrarily abrogated by an executive officer. Such a course of action, or in this case inaction, abhors the concept of rule of law." *Cooper v. Gwinn*, 171 W.Va. 245, 256, 298 S.E.2d 781, 792 (1981). In the context of inmates in our state prisons, we stated that

> the lack of funds is not a valid excuse for denying inmates, and society as a whole, the constitutional right to the benefit of legislative enactments which clearly establish the duty of the Department of Corrections to rehabilitate individuals charged to its care, and the concommitant [sic] right of those individuals to demand the benefit of those laws.

*Id.*, 171 W.Va. at 255, 298 S.E.2d at 791-92.

The Legislature has provided certain rights to patients confined in our state psychiatric hospitals. W.Va. Code § 27-5-9. Accordingly, "[i]t is the obligation of the State to provide the resources necessary to accord [patients] of State mental institutions the rights which the State has granted them under *W.Va. Code*, 27-5-9 [1977]." *Matin I*, 168 W.Va. 248, 284 S.E.2d 232, syl. pt. 3. To that end, the appendix record reflects the DHHR's intent in the fall of 2014 to fund its court-approved plan within its current budget by using "various funds . . . within the [DHHR] . . . controlled by the Secretary" and through savings on expenditures that were otherwise paid to short-term contract employees. If those means

41

proved insufficient, then it planned to seek additional funding from the Legislature.[54] Consequently, we find no merit in the DHHR's contention that the circuit court has limited the Legislature's authority over the DHHR's budget.

## IV. Conclusion

The circuit court has conscientiously and with great care presided over this institutional reform litigation since 1981. It is our fervent hope that the DHHR will assume a proactive, rather than its customary reactive, role in this matter, and that through strong leadership and innovation, it will move forward with alacrity in meeting its statutory and regulatory obligations without the continuing need for judicial oversight.

For the reasons expressed herein, the June 3, 2014, and August 13, 2014, orders of the Circuit Court of Kanawha County are hereby affirmed, in part, and reversed, in part.

AFFIRMED, in part, and REVERSED, in part.

---

[54]If additional funding from the Legislature became necessary, presumably the DHHR undertook the steps to secure that funding.

42