IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

**FILED**
**April 29, 2026**
**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 24-658

STATE OF WEST VIRGINIA ex rel.
WEST VIRGINIA DEPARTMENT OF HUMAN SERVICES,

Petitioner,

v.

THE HONORABLE STEVEN REDDING, Judge of the Circuit Court
of Berkeley County,

Respondent.

ORIGINAL PROCEEDING IN PROHIBITION

WRIT GRANTED

AND

No. 24-659

STATE OF WEST VIRGINIA ex rel.
WEST VIRGINIA DEPARTMENT OF HUMAN SERVICES,

Petitioner,

v.

THE HONORABLE STEVEN REDDING, Judge of the Circuit Court
of Berkeley County,

Respondent.

ORIGINAL PROCEEDING IN PROHIBITION

WRIT GRANTED

Submitted: February 11, 2026
Filed: April 29, 2026

John B. McCuskey, Jr., Esq.
Attorney General
Caleb B. David, Esq.
Deputy Solicitor General
Randy K. Miller, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Petitioner

J. Zak Ritchie, Esq.
Hissam Forman Donovan Ritchie PLLC
Charleston, West Virginia
Attorney for Respondent

CHIEF JUSTICE BUNN delivered the Opinion of the Court.
JUSTICE TRUMP, deeming himself disqualified, did not participate in the decision of this case.
JUDGE AMY MANN sitting by temporary assignment.

SYLLABUS BY THE COURT

1.    "'The writ of prohibition will issue only in clear cases where the inferior tribunal is proceeding without, or in excess of, jurisdiction.' Syl., *State ex rel. Vineyard v. O'Brien*, 100 W.Va. 163, 130 S.E. 111 (1925)." Syllabus Point 1, *State ex rel. Johnson v. Reed*, 219 W. Va. 289, 633 S.E.2d 234 (2006).

2.    "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

i

3. "Article V, section 1 of the Constitution of West Virginia which prohibits any one department of our state government from exercising the powers of the others, is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed." Syllabus Point 1, *State ex rel. Barker v. Manchin*, 167 W. Va. 155, 279 S.E.2d 622 (1981).

**BUNN, Chief Justice:**

Petitioner West Virginia Department of Human Services ("DHS") invokes this Court's original jurisdiction to prohibit enforcement of orders issued by The Honorable Steven Redding, Judge of the Circuit Court of Berkeley County ("respondent") requiring DHS to produce information about local Child Protective Services ("CPS") operations. Specifically, the orders require DHS to provide information regarding outstanding CPS abuse and neglect referrals, open local CPS investigative positions, and the "adequa[cy]" of DHS's local support. DHS argues that the orders violate the separation of powers by encroaching on the operations of an executive agency and were issued in excess of the circuit court's legitimate powers. Respondent claims that the DHS orders are designed to unearth "structural" deficiencies causing delay in the investigation of CPS referrals and that the circuit court is empowered to compel production of this information pursuant to its obligations under West Virginia Code Chapter 49 and as part of his general charge to protect the welfare of children in the 23rd Judicial Circuit.

Because the subject orders did not derive of a justiciable controversy and we find no constitutional, statutory, or other powers authorizing their issuance, we find that the circuit court lacks jurisdiction to issue or enforce the orders. Accordingly, we grant DHS's request for relief in prohibition.

1

## I. FACTS AND PROCEDURAL HISTORY

DHS filed these consolidated petitions for writ of prohibition regarding orders issued in two separate and unrelated abuse and neglect proceedings pending before respondent in the Circuit Court of Berkeley County, West Virginia. Respondent contends that in each case he observed a concerning delay between the initial investigatory referral to CPS and DHS's filing of the abuse and neglect petition. This perceived delay caused him to suspect recurrence of a "backlog" at the Berkeley County CPS office that "reached crisis level" in 2019 and had prompted him to issue a show cause order against DHS to address Berkeley County's lack of responsiveness to abuse and neglect referrals.[1]

On September 20, 2024, and October 30, 2024, respectively, respondent issued an order in each of the underlying abuse and neglect proceedings recounting the alleged delay between the CPS referral and the filing of the abuse and neglect petition in the respective cases (the "DHS orders").[2] Each order expresses respondent's "grave

---

[1] Although the appendix record contains no additional information regarding this 2019 show cause order or, importantly, the procedural history surrounding it, respondent represents that the 2019 show cause order was issued to address a backlog of CPS referrals in Berkeley and Jefferson Counties and generated numerous hearings and the submission of multiple reports by DHS. Respondent claims that the show cause order yielded a decrease in the backlog and improvement in local worker pay and retention rates. He indicates that the "case" was "end[ed]" on June 8, 2020, and that DHS represented that it would be "fully transparent" and cooperative with him on these issues going forward. Neither the record nor briefs suggest DHS appealed or sought extraordinary relief regarding the show cause order.

[2] Although the circumstances surrounding the alleged delay in the underlying abuse and neglect cases are not relevant to our disposition, we provide a brief procedural history

concerns that Berkeley County has again failed to meet it's [sic] statutory and administrative responsibility to timely and effectively process and take action upon referrals being received[,]" and requires DHS to provide the court with information about the number of outstanding abuse and neglect referrals and the adequacy of staffing and State-level support within the Berkeley County CPS office.

---

of those cases as set forth in the DHS orders and the parties' briefs to give context to respondent's concerns.

In *In re: H.R. and A.R.*, Berkeley Co. Case Nos. CC-02-2024-JA-158 and -159, respondent entered an Administrative Order on March 28, 2024 initiating a pre-petition investigation by DHS, pursuant to West Virginia Rule of Child Abuse and Neglect Proceedings 3A, alleging the mother was suffering a mental health crisis. On April 2, 2024, DHS received the referral and completed its investigation that month; in early May, DHS submitted a report to the court finding the referral unsubstantiated. On May 10, 2024, acknowledging receipt of that report, respondent entered an order closing the case because DHS "submitted an Investigation report[] . . . indicat[ing] that *no Petition should be filed*." (emphasis added). However, two additional referrals were made on July 26 and 29, 2024, reporting inappropriate sexual contact by the biological father and the mother's boyfriend, respectively. DHS filed an abuse and neglect petition on August 6, 2024. The DHS order detailing this procedural history alleges that between the initial referral in April and petition filing four months later, no "apparent action [was taken] by CPS[.]" The DHS order includes no reference to the investigation and administrative closure order that occurred in April and May, respectively.

In *In re: H.L. and J.L.*, Berkeley Co. Case Nos. CC-02-2024-JA-225 and -226, the DHS order states that a referral as to these children was made on June 22, 2023, alleging sexual, physical, psychological, and emotional abuse, as well as domestic violence, by the respondent stepfather. CPS received an additional referral in October 2023 regarding these same allegations. DHS filed an abuse and neglect petition approximately one year later, on October 4, 2024.

Respondent indicates that he entered a third DHS order in *In re: R.K. and N.P.*, Case Nos. 2024-JA-264 and -265 on December 11, 2024.

More specifically, the DHS orders direct Deborah F. Edelen, DHS Social Service District Manager or a designee, to provide the following information to the circuit court within fourteen days of the order: 1) a comprehensive list of all outstanding referrals for which no action has been taken, the date the referrals were received, and the nature of the abuse or neglect reported; 2) a list of investigative workers for Berkeley County and the number of vacancies for those positions; and 3) a statement regarding whether the Berkeley County CPS unit is "receiving adequate support and resources from WVDHS on a local and state level."

In his response to DHS's petitions for writ of prohibition, respondent represents that his objective in issuing the orders was to "investigate" and "fashion[]" a "remedy" for the "chronic issue of inadequate [abuse and neglect] referral response times[.]" Upon DHS's objection and motion, the circuit court stayed the orders to permit DHS to seek these writs of prohibition.

## II.    STANDARD OF REVIEW

It is well-established that "'[t]he writ of prohibition will issue only in clear cases where the inferior tribunal is proceeding without, or in excess of, jurisdiction.' Syl., *State ex rel. Vineyard v. O'Brien*, 100 W.Va. 163, 130 S.E. 111 (1925)." Syl. Pt. 1, *State ex rel. Johnson v. Reed*, 219 W. Va. 289, 633 S.E.2d 234 (2006). Moreover, prohibition will also lie where the lower tribunal is alleged to be acting in excess of its "legitimate

4

powers." Syl. Pt. 4, in part, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996). With respect to the latter, we have held:

> [i]n determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

*Id*. We apply these standards to the parties' arguments.

## III. DISCUSSION

DHS argues that the orders encroach on the executive branch functions of DHS in violation of the separation of powers doctrine.[3] It argues further that the orders are immaterial to the abuse and neglect proceedings in which they were issued and therefore neither pertain to a justiciable "case or controversy" nor find statutory authorization within

---

[3] DHS also suggests that the orders are "retaliation" for "perceived shortfalls" of DHS and that respondent has "continuously sought to control" "staffing conditions and agency operations" through the use of contempt proceedings. Respondent denies any such animus.

the child welfare provisions of West Virginia Code Chapter 49. Respondent counters that the orders merely seek information from DHS and therefore do not encroach into DHS's powers. He argues that the "joint mandate" of DHS and the circuit courts outlined in Chapter 49 authorizes and obligates him to discover and remedy "structural" inadequacies causing investigatory delay in child abuse and neglect proceedings.

### A.    *Separation of Powers*

Article V, section 1 of the Constitution of West Virginia provides that "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]" The separation of powers doctrine "is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed." Syl. Pt. 1, in part, *State ex rel. Barker v. Manchin*, 167 W. Va. 155, 279 S.E.2d 622 (1981). With respect to the judiciary's encroachment into the administrative functions of the executive branch, the Court long ago stated that "we do not think [the Legislature] possesses the power to require any court to act as an 'administrative agency'; and any court which acts in such capacity violates the plain provisions of our Constitution." *Sims v. Fisher*, 125 W. Va. 512, 525, 25 S.E.2d 216, 222 (1943).

In the context of abuse and neglect proceedings specifically, this Court has historically invoked the separation of powers to restrain lower courts from improperly intruding into DHS operations. Nearly twenty years ago, the Court rejected, in part, a

6

circuit court's efforts to "supervise" local CPS operations in *In re Brandon H.S.*, 218 W. Va. 724, 629 S.E.2d 783 (2006) (per curiam). The circuit court in *In re Brandon H.S.* observed that the local CPS office was understaffed, prompting the respondent father and guardian ad litem to file a petition for contempt against DHS for failure to "properly staff this case and . . . the resulting delay in scheduling visitation, as well as in initiating drug-related services." *Id*. at 727, 629 S.E.2d at 786. The circuit court found DHS in contempt of its obligations "'in the present case[]'" and ordered CPS to implement certain staffing directives, including geographic pay differentials, "'to assure the "safety and guidance" of other children in its custody and in the Eastern Panhandle of West Virginia.'" *Id*. at 727-28, 629 S.E.2d at 786-87.

Notwithstanding the circuit court's laudable concerns about the impact of CPS staffing on child welfare, the Court found the direction to provide geographic pay differentials a violation of the separation of powers. *Id*. at 730, 629 S.E.2d at 789. The Court empathized with the circuit court's plight of "regularly presiding over abuse and neglect cases during a period when [DHS] staff vacancies reached crisis proportions," but found "the extreme nature of those facts does not justify an invasion of the executive branch's province to set the salaries of its employees." *Id*. at 731, 629 S.E.2d at 790.[4]

---

[4] We acknowledge, however, that the *In re Brandon H.S.* Court affirmed that aspect of the circuit court's order "compel[ling] the Department to act to remedy the serious effects of the significant staff shortage at issue, specifically, in this case and, generally, in other abuse and neglect proceedings before that court." *Id*. at 729, 629 S.E.2d at 788. The

7

More recently, this Court granted prohibition to restrain a circuit court from ordering DHS to continue to operate a juvenile facility. *See State ex rel. W. Va. Dep't of Hum. Servs. v. Wilmoth*, No. 24-728, 2025 WL 914419 (W. Va. Mar. 25, 2025) (memorandum decision). In *Wilmoth*, the circuit court unilaterally entered an administrative order in various pending abuse and neglect actions that ordered DHS to continue operating a juvenile facility it had planned to close, citing the court's "authority regarding juvenile placements." *Id.* at *3. Because the circuit court's order constituted a "clear encroachment into executive function," we found that the separation of powers required us grant a writ of prohibition to ensure proper division of "the distinct responsibilities of two branches of government as to juvenile facilities and services." *Id.*

Respondent readily acknowledges that the ultimate objective in issuing the DHS orders was to "remedy" any deficiencies the responsive information revealed. He further acknowledges that "*subsequent* judicial action []based upon the compliance with these orders[]" is subject to separation of powers scrutiny but maintains that issue is not yet ripe because the DHS orders constitute simple information-gathering. We agree. The

Court justified the broader reach of circuit court's order by citing to now-repealed West Virginia Code § 49-6D-2(a), which provided that the child welfare statutes were enacted "to provide for the protection of the children of this State from abuse and neglect and to *provide direction to responsible state officers*." *Id.* at 730, 629 S.E.2d at 789. The Court reasoned that "the trial court was acting in furtherance of the legislatively recognized need to 'provide direction to responsible state officers' in the interest of securing the full and proper implementation of specific abuse and neglect statutes." *Id.* Neither this statutory language nor any language approximating it was incorporated into the 2015 recodification of Chapter 49.

8

information production required by the DHS orders does not go so far as to exercise "powers properly belonging to" DHS, regardless of respondent's intended use of that information. However, while the DHS orders present no separation of powers violation *per se*, the DHS's alternative "case or controversy" argument strikes at a related—and valid—concern.

### B. *"Case or Controversy"*

Although the DHS orders present no traditional separation of powers violation, courts have correctly observed that the "case or controversy" requirement operates in aid of the separation of powers: "The limitation on the exercise of judicial power to the decision of justiciable controversies has been attributed to judicial adherence to the doctrine of separation of powers." *Merkle v. Guardianship of Jacoby*, 912 So. 2d 595, 600 (Fla. Dist. Ct. App. 2005); *see also State ex rel. Morrison v. Sebelius*, 179 P.3d 366, 382 (Kan. 2008) ("In recognizing a constitutional case-or-controversy requirement, Kansas courts have relied solely on the separation of powers doctrine embodied in the Kansas constitutional framework."). In fact, this Court's description of the separation of powers likewise encapsulates the requirement of a "case or controversy": "[T]he Legislature enacts the law, the Governor and the various agencies of the executive implement the law, and the courts interpret the law, *adjudicating individual disputes arising thereunder." Barker*, 167 W. Va. at 168, 279 S.E.2d at 631 (emphasis added). As explained by the current Chief Justice of the United States Supreme Court, the case or controversy requirement venerates the separation of powers in that it "ensures that the court

is carrying out *its* function of deciding a case or controversy, rather than fulfilling the executive's responsibility of taking care that the laws be faithfully executed." John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1230 (1993).[5]

But the DHS's justiciable controversy argument not only better conforms to the ostensible defect in the DHS orders, it squarely implicates the circuit court's jurisdiction to issue or enforce them. The Court has stated that the "constitutional jurisdiction of circuit courts extends only to 'cases or controversies' that have adversarial character." *Application of Dailey*, 195 W. Va. 330, 340, 465 S.E.2d 601, 611 (1995). Putting a finer point on this requisite "adversarial character," we more recently explained that "Article VIII, Section 6 of the West Virginia Constitution establishes that there must be a justiciable case or controversy—a legal right claimed by one party and denied by another—in order for the circuit court to have subject matter jurisdiction." *State ex rel.*

---

[5] Chief Justice Roberts explained further that

> [b]y properly contenting itself with the decision of actual cases or controversies at the instance of someone suffering distinct and palpable injury, the judiciary leaves for the political branches the generalized grievances that are their responsibility under the Constitution. Far from an assault on the other branches, this is an insistence that they are supreme within their respective spheres, protected from intrusion-however welcome or invited-of the judiciary.

*Id*. at 1229-30.

*Healthport Techs., LLC v. Stucky*, 239 W. Va. 239, 242, 800 S.E.2d 506, 509 (2017) (footnote omitted).

Although respondent issued the DHS orders in individual abuse and neglect proceedings—which were obviously live, justiciable controversies—DHS argues that the orders bore no relevance to any issues in those cases, thereby stripping the circuit court of jurisdiction to issue or enforce them for lack of a "case or controversy." Respondent, by counsel, concedes that the DHS orders were not intended to address a then-existing issue in the underlying abuse and neglect proceedings and identifies no actionable, pending controversy to which the DHS orders pertain.[6]

Instead, respondent likens his issuance of the DHS orders to relief granted by circuit courts in institutional reform litigation. In fact, he contrasts the limited investigatory scope of the DHS orders with the more broad-sweeping directives aimed at rectifying "systemic failures of state agencies" that this Court has previously affirmed. Citing cases like *West Virginia Department of Health & Human Resources, Bureau for Behavioral Health & Health Facilities v. E.H.*, 236 W. Va. 194, 778 S.E.2d 643 (2015),

---

[6] Despite this admission, at oral argument, respondent's counsel suggested that the investigatory delay had potential relevancy to the findings required under West Virginia Code § 49-4-602(a) and (b) (2015) regarding "[w]hether or not the department made reasonable efforts to preserve the family and to prevent" emergency placement or removal from the home. As more fully addressed *infra*, while pre-petition circumstances may be material to these "reasonable efforts," only circumstances pertaining to the specific children at issue are germane.

11

respondent contends that the DHS orders "modest[ly]" reflect the same type of judicial supervision of "executive branch . . . reform efforts" affirmed in those cases. [7]

However, these comparator cases underscore the absence of a justiciable controversy surrounding the DHS orders. Each of the cases cited by respondent was initiated by a party with standing, against an adverse party, and the relief awarded was within the scope of the legal issue successfully adjudicated in the action. For example, in *E.H.*, a group of patients filed a mandamus action in this Court "seeking judicial intervention for deplorable conditions" at the Mildred Mitchell-Bateman Hospital, a State-run psychiatric hospital. *Id*. at 197, 778 S.E.2d at 646. The Court transferred the case to Kanawha County where the parties entered numerous agreed orders designed to improve

---

[7] Other cases cited by respondent arose from actions invoking the Court's original jurisdiction, seeking the specific institutional reform at issue, and often resulted only in transfer to the lower court for fact-finding and/or development of plan to comply with statutory or constitutional requirements. *See, e.g., State ex rel. Smith v. Skaff*, 187 W. Va. 651, 655, 420 S.E.2d 922, 926 (1992) (prisoner's petition for writ of habeas corpus invoked Court's original jurisdiction and Court directed Division of Corrections to "develop a plan" in accordance with its statutory requirements); *State ex rel. J.D.W. v. Harris*, 173 W. Va. 690, 319 S.E.2d 815 (1984) (residents of juvenile correctional facility invoked Court's original jurisdiction and Court transferred case to Kanawha County for factual development); *Cooper v. Gwinn*, 171 W. Va. 245, 298 S.E.2d 781 (1981) (same).

More recently, in *State ex rel. West Virginia Department of Health & Human Resources v. Bloom*, we considered the appropriate reach of a similar mandamus action seeking to compel DHS to address the "limited issues of employee staffing, retention, and training" in the local CPS office. 247 W. Va. 433, 436, 880 S.E.2d 899, 902 (2022). Importantly, however, the action was initiated by a petition for contempt filed by guardians ad litem in a specific abuse and neglect matter which the circuit court transferred and maintained in a separate mandamus action as agreed to by the parties. *Id*. at 441, 880 S.E.2d at 907.

12

patient conditions, in compliance with the mandatory duties of DHS's predecessor agency,

Department of Health and Human Resources ("DHHR"). *Id*. at 197-98, 778 S.E.2d at 647-

48. The *E.H.* Court made clear that the circuit court's requirement that DHHR comply with

its prior agreement to develop a plan to improve conditions did not constitute judicial

intrusion into the executive's affairs:

> We are compelled to find that requiring the DHHR to develop a plan for immediate implementation, which would allow it to comply with court-ordered, statutory, and regulatory obligations—obligations previously consented to by the DHHR—does not transform the DHHR's plan into the circuit court's plan. Neither does it violate the separation of powers doctrine.

*Id*. at 211, 778 S.E.2d at 660.

Similarly, in *Crain v. Bordenkircher*, prisoners filed consolidated petitions

for writ of habeas corpus under the Court's original jurisdiction seeking release from

deplorable conditions at the West Virginia Penitentiary in Moundsville. 180 W. Va. 246,

246, 376 S.E.2d 140, 141 (1988), *modified*, 187 W. Va. 596, 420 S.E.2d 732 (1992),

*modified*, 191 W. Va. 583, 447 S.E.2d 275 (1994). Upon a conclusive finding that the

penitentiary conditions violated the West Virginia Constitution, we issued a rule to show

cause regarding the penitentiary's placement into receivership and awarded mandamus

relief requiring the State to fund and construct a new facility. 180 W. Va. at 250, 376 S.E.2d

at 144. Cognizant of the State's failure to cure the constitutionally deficient facilities, the

*Crain* Court emphasized that the relief afforded was not a judicial intrusion into the State's

oversight of prison facilities, but mandated by the prisoners' successful adjudication of

13

their constitutional claims: "We point out, however, that the action before us was not initiated by this Court, and the parties before us are entitled to a determination of the questions raised in their petition." *Id*. at 248, 376 S.E.2d at 142.

Further, the United States Fourth Circuit Court of Appeals recently contrasted the scope of individual abuse and neglect proceedings and the far broader reach of institutional reform litigation. *See Jonathan R. by Dixon v. Justice*, 41 F.4th 316 (4th Cir. 2022). In *Jonathan R*., the putative class plaintiffs sought "systematic, structural change" in DHS practices, including overhaul of staffing and mitigation of delays—similar to the concerns expressed by respondent. *Id*. at 323. DHS argued for abstention, in part, because the putative class would "'unduly interfere'" with the abuse and neglect processes in West Virginia's circuit courts, specifically statutory periodic review hearings. *Id*. at 328. Distinguishing individual abuse and neglect cases from the systemic change sought by the putative class, the Fourth Circuit emphasized that circuit courts presiding over abuse and neglect proceedings are focused on the "immediate circumstances in front of the court" and "adjudicate only the case-specific arguments the parties brought before the court." *Id*. at 335-38. Therefore, the Court concluded that "an individual foster child is unlikely to have standing to ask for systemic changes not tied directly to her own maltreatment." *Id*. at 336.[8]

---

[8] Respondent cites the following language from *Jonathan R*. claiming it supports his "joint mandate" argument. In generally describing our abuse and neglect construct, the Fourth Circuit summarily stated that "[DHS] maintains responsibility for planning and delivering the care, the circuit courts for supervising it." *Id*. at 322. This generalization,

14

We observe that restraint from instigating and purporting to "cure" issues where there exists no justiciable controversy is required not only of lower courts, but this Court as well. In *Harshbarger v. Gainer*, the Court criticized its prior decision of *In re Dostert*[9] for rulings regarding the constitutionality of the judicial retirement system that were not implicated in what was otherwise a "pedestrian disciplinary proceeding." 184 W. Va. 656, 658, 403 S.E.2d 399, 401 (1991). Because the *Dostert* court considered a broad-sweeping constitutional issue neither raised nor adjudicated in the disciplinary proceeding before it, the *Harshbarger* Court found that *Dostert*'s ruling on this "forged" issue violated the justiciable controversy requirement. *Id*. at 659, 403 S.E.2d at 402. The Court explained: "We had no right to raise any issues on our own initiative . . . because there was no *real* issue in the case to which tangential issues might reasonably relate." *Id*. at 660, 403 S.E.2d at 403.[10]

---

however, is not fairly read to sanction a circuit court's general supervisory role over the operations of DHS, in excess of constitutional or statutory authority.

[9] 174 W. Va. 258, 324 S.E.2d 402 (1984), *overruled by Harshbarger v. Gainer,* 184 W. Va. 656, 403 S.E.2d 399 (1991).

[10] This recognition in *Harshbarger* pertains to the Court's origination of issues not properly presented in the case and does not speak to the Court's ability to sua sponte address jurisdictional issues, to consider issues raised for the first time on appeal, or to affirm judgment on alternative grounds appearing from the record. *See* Syl. Pt. 2, in part, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995) ("Where neither party to an appeal raises, briefs, or argues a jurisdictional question presented, this Court has the inherent power and duty to determine unilaterally its authority to hear a particular case."); *PITA, LLC v. Segal*, 249 W. Va. 26, 40, 894 S.E.2d 379, 393 (Ct. App. 2023) ("As a general rule, however, an appellate court will not consider an issue raised for the first time on

15

As these cases demonstrate, directives issued to the executive branch must, at a minimum, arise from a case or controversy brought to the court, litigated by adverse parties, and be issued within the scope of the relief required by the litigants' successful adjudication of their claims. Here, there is no indication a party to these proceedings raised—much less sought adjudication of or relief arising from—local CPS investigatory delays. Nor does respondent even assert as much: he makes clear that the DHS orders were issued based upon personal observations in docketed cases prompting him to inquire into the staffing and efficiency of the local CPS office for the purpose of "remedy[ing]" any deficiencies, just as he claims to have accomplished with the 2019 show cause order. The DHS orders bear striking similarity to the "unilateral[]" administrative order that we prohibited in *Wilmoth* requiring DHS to continue operating a juvenile facility, in part, because "no person or entity requested judicial action[.]" 2025 WL 914419, at *2. As such, we agree with DHS that the DHS orders do not derive of a justiciable controversy—threatening the circuit court's jurisdiction to issue or enforce them.[11]

---

appeal. Exceptions to this rule include issues involving subject matter jurisdiction, plain error, or an important constitutional question. Furthermore, an appellate court may affirm a correct decision based on any grounds supported by the record, 'regardless of the ground, reason or theory asserted by the lower court as the basis for its judgment.'" (citations omitted) (footnotes omitted)).

[11] The DHS orders likewise lack the requisite "adversarial character" we outlined in *Dailey*. 195 W. Va. at 340, 465 S.E.2d at 611. At best, the unilateral issuance of the DHS orders effectively places the *circuit court* in an adversarial posture with DHS, not based on the circumstances placed before it by the parties, but based on the court's own anecdotal concerns, however well-founded or well-intentioned.

### C. Statutory Authority under West Virginia Code Chapter 49

Having determined that the DHS orders do not derive of a justiciable case or controversy, we turn to respondent's insistence that both our statutory abuse and neglect scheme, coupled with the "equitable and plenary powers of the circuit court," require and empower him to "identify, then address and if possible, eradicate" systemic issues contributing to unacceptable delays in the institution of abuse and neglect proceedings. We therefore examine whether respondent enjoys an alternative source of authority to investigate the operations of DHS or require it to produce information under the auspices of "live" abuse and neglect proceedings.

The West Virginia Constitution gives no general investigatory or supervisory powers to circuit courts over executive departments or agencies; its only supervisory authority is over magistrate courts. W. Va. Const. art. VIII, § 6 ("Subject to the supervisory control of the supreme court of appeals, each circuit court shall have general supervisory control over all magistrate courts in the circuit."). Nor do circuit courts have general "plenary" powers as characterized by respondent; their powers are constitutionally prescribed and jurisdictionally limited to justiciable controversies pending before them, as discussed above.[12] *See Hanson v. Bd. of Educ. of the Cnty. of Mineral*, 198 W. Va. 6, 10,

---

[12] Although he does not expressly invoke this authority, to the extent that respondent's reference to the "plenary and equitable" powers of the circuit court refers to the court's *inherent* authority, this argument similarly fails. We have recognized that "[t]rial courts have the inherent power to manage their judicial affairs that arise during proceedings in their courts[.]" Syl. Pt. 2, in part, *B.F. Specialty Co. v. Charles M. Sledd*

17

479 S.E.2d 305, 309 (1996) ("Although a circuit court, as a court of general jurisdiction, has substantial power, it lacks the inherent power to consider a new cause of action within the framework of a previous suit. Usually we applaud efforts to achieve judicial economy, but such efforts cannot expand the power of the court to hear and determine a case. This power is granted by the constitution, statute or common law, and the Rules of Civil Procedure must be followed in order to activate that power."). However, the Constitution further provides that "[c]ircuit courts shall also have such other jurisdiction, authority or power, original or appellate or concurrent, as may be prescribed by law." W. Va. Const. art. VIII, § 6.

In that regard, respondent relies heavily on the statutory role of the circuit court that permeates the abuse and neglect scheme in West Virginia Code §§ 49-4-601 through 610 to authorize his inquiry into the child protective services administered by DHS. He insists that these statutes do not relegate circuit courts to "passive arbiters"

---

*Co.*, 197 W. Va. 463, 475 S.E.2d 555 (1996). We have also endorsed the use of a court's inherent authority to reach outside the judiciary to acquire resources to perform judicial functions. *See State ex rel. Lambert v. Stephens*, 200 W. Va. 802, 811, 490 S.E.2d 891, 900 (1997) ("[C]ourts have inherent authority to require resources such as sufficient funds for operating expenses, work space, parking space, supplies, and other material items." (footnotes omitted)). However, inherent authority does not supplant jurisdictional requirements: "A court 'has inherent power to do all things that are reasonably necessary for the administration of justice *within the scope of its jurisdiction*.' 14 Am. Juris., Courts, section 171." Syl. Pt. 3, *Shields v. Romine*, 122 W. Va. 639, 13 S.E.2d 16 (1940) (emphasis added).

Moreover, each instance in which the Court has endorsed a circuit court's use of its inherent authority is limited to managing the proceedings before it, matters within its supervisory purview, or which are necessary to perform its operational judicial functions.

18

confined to the "four corners of a[n] [abuse and neglect] petition[.]" However, respondent directs us to no particular provision of our general child welfare laws or specific abuse and neglect statutes authorizing the circuit court to inquire into DHS's pre-petition investigatory functions and we find none.

What we find instead is a well-established and carefully curated system that delegates to the executive branch the administrative oversight of children's care and well-being and vests the judiciary with the authority to adjudicate deficits in or dereliction of that care for children who are subject to pending judicial proceedings, providing the court with jurisdiction over them. With respect to pre-petition investigation, West Virginia Code § 49-2-802(b) (2024) provides that "[t]he local child protective services office shall investigate all reports of child abuse or neglect." More specifically, subsection (c)(3) provides that "[u]pon notification of suspected child abuse or neglect, [the local CPS office shall] commence or cause to be commenced a thorough investigation of the report and the child's environment." *Id.*, § 49-2-802(c)(3). The preeminence of local CPS to investigate reports of child abuse and neglect—and the confinement of the court's role to specific children involved in pending controversies—is reinforced in West Virginia Code § 49-2-802(c)(6) which provides that

> when any matter regarding child custody *is pending*, the circuit court or family court may refer allegations of child abuse and neglect to the local child protective services office for investigation of the allegations as defined by this chapter and require the local child protective services office to submit a written report of the investigation to the referring circuit court

19

or family court within the time frames set forth by the circuit court or family court.

(emphasis added); *see also* W. Va. R. Child Abuse and Neglect Proc. 3A(a) ("Upon receiving a written referral from a family court pursuant to Rule 48 of the Rules of Practice and Procedure for Family Courts, a circuit court shall forthwith cause to be entered and served an administrative order in the name of and regarding the affected child or children directing the Department to submit to the court an investigation report[.]"). Therefore, even where a court becomes aware of potential child abuse or neglect during pending child custody proceedings, this provision requires referral to CPS for investigation, just as respondent did in one of the underlying abuse and neglect actions.

That is not to say, however, that the circuit court is entirely removed from pre-petition inquiries—only that its role in that regard is carefully prescribed. Rule 3A provides that where the court makes an investigatory referral arising out of a child custody matter and DHS declines to file a petition, the circuit court may convert the referral to a mandamus action and issue a show cause order as to why a petition should not be filed if it disagrees with the investigatory findings. *See* W. Va. R. Child Abuse and Neglect Proceedings 3A(b) ("Following review of an investigation report in which the Department concludes that a civil petition is unnecessary, if the circuit court believes that the information in the family court's written referral and the Department's investigation report, considered together, suggest circumstances upon which the Department would have a duty to file a civil petition, the court shall treat the written referral as a petition for a writ of

20

mandamus in the name of and regarding the affected child or children."). However, even under such a mandamus proceeding, the circuit court is limited to determining whether DHS "has a *nondiscretionary* duty pursuant to W. Va. Code § 49-4-605 to file a petition seeking to terminate parental rights[]" and, importantly:

> If it is determined that the circumstances bring the filing decision within the Department's *discretionary* authority, no such writ shall issue unless the court specifically finds aggravated circumstances, consistent with the meaning and usage of that term in W. Va. Code § 49-4-602(d)(1), and that the Department acted arbitrarily and capriciously in the exercise of its discretion.

*Id*. (emphasis added). *Cf. In re Brandon H.S.*, 218 W. Va. at 731, 629 S.E.2d at 790 (distinguishing a circuit court's proper use of authority to enforce "mandatory" obligations of DHS from non-enforceable directives insinuating the court into DHS affairs involving "the critical element of discretion").

Further, as raised by respondent during oral argument, upon entry of the initial order or at the preliminary hearing, the circuit court is required to make findings justifying any removal of the child from the home. Upon filing a petition, the "initial order directing custody" must contain findings as to "[w]hether or not the department made reasonable efforts to preserve the family and prevent the placement or that the emergency situation made those efforts unreasonable or impossible." W. Va. Code § 49-4-602(a)(4)(B). Similarly, the court's order at any preliminary hearing must include "[w]hether or not the department made reasonable efforts to preserve the family and to prevent the child's removal from his or her home[.]" *Id*., §49-4-602(b)(2). These findings

21

may require the circuit court to inquire into CPS's pre-petition investigation and actions. However, these inquiries are very plainly confined to the circumstances surrounding the children involved *in that case*, over whom the court exercises jurisdiction. Even so, once a petition has been filed, the existence of any pre-petition investigatory delay as to those children cannot be cured and the proceedings give way to the adjudicatory and dispositional inquiries designed to reunify the family or otherwise serve the children's best interests.

None of the foregoing "relegates" or diminishes the circuit court's importance or role in abuse and neglect proceedings, nor undermines the correlative duties circuit courts have with DHS's child welfare mandate. In fact, the Court has recently acknowledged these "intersecting obligations of the executive and the judiciary branches[]" in abuse and neglect proceedings. *In re D.H.*, 252 W. Va. 290, ___, 922 S.E.2d 290, 298 (2024). In *In re D.H.* we found that the circuit court's requirement that DHS join in an abuse and neglect petition did not violate the separation of powers doctrine because both "the judiciary and the executive branch have an obligation to act in the best interests of children." *Id*. at ___, 922 S.E.2d at 298-99.

However, our language from *In re D.H.* did not augment the carefully outlined statutory role of courts in abuse and neglect proceedings, enabling them to assume ownership over the general child welfare obligations of DHS. In fact, our opinion makes clear that the court's joint obligation with DHS derives of the "*statutory* framework laying out [these] mutual obligations[.]" *Id*. at 299 (emphasis added). Moreover, nothing in *In re*

22

*D.H.* purports to extend the circuit court's procedural and substantive obligations to the specific children named in abuse and neglect proceedings to all children within a particular judicial circuit. Instead, our analysis rested on the "corollary obligations of the judiciary and the executive branch to protect the best interest of *the children involved in an abuse and neglect proceeding*." *Id*. (emphasis added).

Tension between the State's child welfare obligations and the courts' responsibilities are not unique to West Virginia, but yield to the same jurisdictional and statutory prerequisites regardless of locale. For example, the necessity of statutory authority to require DHS to produce information is demonstrated in a similar case considered by the Florida District Court of Appeals. *See Dep't of Child. & Fam. Servs. v. I.C.*, 742 So.2d 401, 405 (Fla. Dist. Ct. App. 1999). The lower court in *I.C.* became "outraged" by the temporary housing of juveniles at the Department of Children & Family Services' administrative offices and ordered the Department to produce an "accounting of all of the children at the assessment center for the past week, including their names, their diagnoses, and the length of time each had been in the system[]" and "immediately terminate the practice of temporarily housing children" at the assessment center. *Id*. at 402-03. The district court found the directive to cease housing children at the center to be a separation of powers violation because the order "interfer[ed] with the general operations of the agency[.]" *Id*. at 405. Observing that "the court has no general jurisdiction over DCF to monitor and evaluate its functioning[] . . . [and] cannot 'micro manage' a facility

23

operated by DCF[,]" the district court more specifically found that "the general condition of other children was not an issue before the court [in I.C.'s case]." *Id*. at 404.

However, in contrast to the instant case, the district court identified a Florida statute empowering the lower court to "'require any such person or agency to make periodic reports to the court containing such information as the court in its discretion may prescribe.'" *Id*. at 405 (quoting Fla. Stat. Ann. § 39.453(8)(g) (emphasis removed)). The court found that this statute "appears to give the court a broad power to obtain information regarding the children *in its division,* which would include the list of names of those held at the assessment center[.]" *Id*. (emphasis added). However, to ensure the lower court exercised its powers over only "children within its jurisdiction[,]" the district court affirmed only that portion of the order requiring a list of juveniles assigned to the trial court's division, to allow the court to initiate a statutorily authorized "judicial review . . . . in connection with . . . *each individual child's case*." *Id*. at 404-05 (emphasis added). We find no such West Virginia statute authorizing respondent's investigatory order or justifying a circuit court's sua sponte undertaking of a review of DHS's state or local operations.

Without question, the abuse and neglect provisions of Chapter 49 charge circuit courts with ensuring the welfare of children over whom it exercises jurisdiction arising from proceedings instituted under those statutes. And while that charge may make circuit courts uniquely privy to recurrent, systemic inefficacies or shortcomings of the

24

agencies charged with child welfare, our Constitution does not permit courts to unilaterally investigate and rectify those issues. "'[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.'" *Greenlaw v. United States*, 554 U. S. 237, 244 (2008) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring)). We commend respondent's advocacy for the welfare of the children in his judicial circuit and his vigilance over DHS's statutory obligations. As we have previously expressed, the Court shares this concern about investigatory delays that arise from inadequate CPS staffing. *See Bloom*, 247 W. Va. at 448, 880 S.E.2d at 914 (expressing the Court's "deep concern regarding . . . allegations of systemic staffing issues in CPS offices statewide[]"). However, the Constitution does not permit us to sanction such advocacy by way of judicial investigation into perceived shortfalls of State government in absence of an adversarial, justiciable controversy or statutory or constitutional authority to do so.

## IV. CONCLUSION

Accordingly, we conclude that respondent lacked jurisdiction to issue the DHS orders and therefore grant the requested writs of prohibition.

Writs Granted.

25